# BRENTWOOD ACADEMY *v.* TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION ET AL.

No. 99–901.   Argued October 11, 2000—Decided February 20, 2001

SOUTER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined, *post*, p. 305.

*James F. Blumstein* argued the cause for petitioner. With him on the briefs were *H. Lee Barfield II* and *G. Thomas Nebel.*

*Deputy Solicitor General Underwood* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Irving L. Gornstein, Dennis J. Dimsey,* and *Gregory B. Friel.*

*Richard L. Colbert* argued the cause and filed a brief for respondents.*

JUSTICE SOUTER delivered the opinion of the Court.

The issue is whether a statewide association incorporated to regulate interscholastic athletic competition among public and private secondary schools may be regarded as engaging in state action when it enforces a rule against a member school. The association in question here includes most public schools located within the State, acts through their representatives, draws its officers from them, is largely funded

---

*Briefs of *amici curiae* urging reversal were filed for the National Women's Law Center et al. by *Marcia D. Greenberger, Barbara A. Burr,* and *Neena K. Chaudhry;* for the Southeast Law Institute by *A. Eric Johnston;* and for the Tennessee Lawyers' Association for Women by *Linda Carver Whitlow Knight.*

Briefs of *amici curiae* urging affirmance were filed for the Florida High School Activities Association, Inc., by *Leonard E. Ireland, Jr.;* for the Interscholastic Associations by *Wayne F. Plaza, Daniel M. Noland, Mallory V. Mayse,* and *Edmund J. Sikorski, Jr.;* and for the Kentucky High School Athletic Association by *Danny C. Reeves* and *David A. French.*

*David A. Wilson, John C. Bonifaz,* and *Brenda Wright* filed a brief for the National Voting Rights Institute as *amicus curiae.*

by their dues and income received in their stead, and has historically been seen to regulate in lieu of the State Board of Education's exercise of its own authority. We hold that the association's regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association, there being no offsetting reason to see the association's acts in any other way.

## I

Respondent Tennessee Secondary School Athletic Association (Association) is a not-for-profit membership corporation organized to regulate interscholastic sport among the public and private high schools in Tennessee that belong to it. No school is forced to join, but without any other authority actually regulating interscholastic athletics, it enjoys the memberships of almost all the State's public high schools (some 290 of them or 84% of the Association's voting membership), far outnumbering the 55 private schools that belong. A member school's team may play or scrimmage only against the team of another member, absent a dispensation.

The Association's rulemaking arm is its legislative council, while its board of control tends to administration. The voting membership of each of these nine-person committees is limited under the Association's bylaws to high school principals, assistant principals, and superintendents elected by the member schools, and the public school administrators who so serve typically attend meetings during regular school hours. Although the Association's staff members are not paid by the State, they are eligible to join the State's public retirement system for its employees. Member schools pay dues to the Association, though the bulk of its revenue is gate receipts at member teams' football and basketball tournaments, many of them held in public arenas rented by the Association.

The constitution, bylaws, and rules of the Association set standards of school membership and the eligibility of students to play in interscholastic games. Each school, for

example, is regulated in awarding financial aid, most coaches must have a Tennessee state teaching license, and players must meet minimum academic standards and hew to limits on student employment. Under the bylaws, "in all matters pertaining to the athletic relations of his school," App. 138, the principal is responsible to the Association, which has the power "to suspend, to fine, or otherwise penalize any member school for the violation of any of the rules of the Association or for other just cause," *id.*, at 100.

Ever since the Association was incorporated in 1925, Tennessee's State Board of Education (State Board) has (to use its own words) acknowledged the corporation's functions "in providing standards, rules and regulations for interscholastic competition in the public schools of Tennessee," *id.*, at 211. More recently, the State Board cited its statutory authority, Tenn. Code Ann. § 49–1–302 (1996) (App. 220), when it adopted language expressing the relationship between the Association and the State Board. Specifically, in 1972, it went so far as to adopt a rule expressly "designat[ing]" the Association as "the organization to supervise and regulate the athletic activities in which the public junior and senior high schools in Tennessee participate on an interscholastic basis." Tennessee State Board of Education, Administrative Rules and Regulations, Rule 0520–1–2–.26 (1972) (later moved to Rule 0520–1–2–.08). The Rule provided that "the authority granted herein shall remain in effect until revoked" and instructed the State Board's chairman to "designate a person or persons to serve in an ex-officio capacity on the [Association's governing bodies]." App. 211. That same year, the State Board specifically approved the Association's rules and regulations, while reserving the right to review future changes. Thus, on several occasions over the next 20 years, the State Board reviewed, approved, or reaffirmed its approval of the recruiting Rule at issue in this case. In 1996, however, the State Board dropped the original Rule 0520–1–2–.08 expressly designating the Association

as regulator; it substituted a statement "recogniz[ing] the value of participation in interscholastic athletics and the role of [the Association] in coordinating interscholastic athletic competition," while "authoriz[ing] the public schools of the state to voluntarily maintain membership in [the Association]." *Id.*, at 220.

The action before us responds to a 1997 regulatory enforcement proceeding brought against petitioner, Brentwood Academy, a private parochial high school member of the Association. The Association's board of control found that Brentwood violated a rule prohibiting "undue influence" in recruiting athletes, when it wrote to incoming students and their parents about spring football practice. The Association accordingly placed Brentwood's athletic program on probation for four years, declared its football and boys' basketball teams ineligible to compete in playoffs for two years, and imposed a $3,000 fine. When these penalties were imposed, all the voting members of the board of control and legislative council were public school administrators.

Brentwood sued the Association and its executive director in federal court under Rev. Stat. § 1979, 42 U. S. C. § 1983, claiming that enforcement of the Rule was state action and a violation of the First and Fourteenth Amendments. The District Court entered summary judgment for Brentwood and enjoined the Association from enforcing the Rule. 13 F. Supp. 2d 670 (MD Tenn. 1998). In holding the Association to be a state actor under § 1983 and the Fourteenth Amendment, the District Court found that the State had delegated authority over high school athletics to the Association, characterized the relationship between the Association and its public school members as symbiotic, and emphasized the predominantly public character of the Association's membership and leadership. The court relied on language in *National Collegiate Athletic Assn.* v. *Tarkanian,* 488 U. S. 179, 193, n. 13 (1988), suggesting that statewide interscholastic athletic associations are state actors, and on other federal cases

in which such organizations had uniformly been held to be acting under color of state law.

The United States Court of Appeals for the Sixth Circuit reversed. 180 F. 3d 758 (1999). It recognized that there is no single test to identify state actions and state actors but applied three criteria derived from *Blum* v. *Yaretsky,* 457 U. S. 991 (1982), *Lugar* v. *Edmondson Oil Co.,* 457 U. S. 922 (1982), and *Rendell-Baker* v. *Kohn,* 457 U. S. 830 (1982), and found no state action under any of them. It said the District Court was mistaken in seeing a symbiotic relationship between the State and the Association, it emphasized that the Association was neither engaging in a traditional and exclusive public function nor responding to state compulsion, and it gave short shrift to the language from *Tarkanian* on which the District Court relied. Rehearing en banc was later denied over the dissent of two judges, who criticized the panel decision for creating a conflict among state and federal courts, for being inconsistent with *Tarkanian,* and for lacking support in the "functional" analysis of private activity required by *West* v. *Atkins,* 487 U. S. 42 (1988), for assessing the significance of cooperation between public officials and a private actor. 190 F. 3d 705 (CA6 1999) (Merritt, J., dissenting from denial of rehearing en banc).

We granted certiorari, 528 U. S. 1153 (2000), to resolve the conflict[1] and now reverse.

---

[1] A number of other courts have held statewide athletic associations to be state actors. *Griffin High School* v. *Illinois High School Assn.,* 822 F. 2d 671, 674 (CA7 1987); *Clark* v. *Arizona Interscholastic Assn.,* 695 F. 2d 1126, 1128 (CA9 1982), cert. denied, 464 U. S. 818 (1983); *In re United States ex rel. Missouri State High School Activities Assn.,* 682 F. 2d 147, 151 (CA8 1982); *Louisiana High School Athletic Assn.* v. *St. Augustine High School,* 396 F. 2d 224, 227–228 (CA5 1968); *Oklahoma High School Athletic Assn.* v. *Bray,* 321 F. 2d 269, 272–273 (CA10 1963); *Indiana High School Athletic Assn.* v. *Carlberg,* 694 N. E. 2d 222, 229 (Ind. 1997); *Mississippi High School Activities Assn., Inc.* v. *Coleman,* 631 So. 2d 768, 774–775 (Miss. 1994); *Kleczek* v. *Rhode Island Interscholastic League, Inc.,* 612 A. 2d 734, 736 (R. I. 1992); see also *Moreland* v. *Western Penn. Inter-*

## II

## A

Our cases try to plot a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not. *Tarkanian, supra,* at 191; *Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345, 349 (1974). The judicial obligation is not only to " 'preserv[e] an area of individual freedom by limiting the reach of federal law' and avoi[d] the imposition of responsibility on a State for conduct it could not control," *Tarkanian, supra,* at 191 (quoting *Lugar, supra,* at 936–937), but also to assure that constitutional standards are invoked "when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains," *Blum, supra,* at 1004 (emphasis in original). If the Fourteenth Amendment is not to be displaced, therefore, its ambit cannot be a simple line between States and people operating outside formally governmental organizations, and the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed. Thus, we say that state action may be found if, though only if, there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself." *Jackson, supra,* at 351.[2]

What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some

*scholastic Athletic League,* 572 F. 2d 121, 125 (CA3 1978) (state action conceded).

[2] If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action "under color of state law" for § 1983 purposes. *Lugar* v. *Edmondson Oil Co.,* 457 U. S. 922, 935 (1982).

countervailing reason against attributing activity to the government. See *Tarkanian,* 488 U. S., at 193, 196; *Polk County* v. *Dodson,* 454 U. S. 312 (1981).

Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," *Blum,* 457 U. S., at 1004, when the State provides "significant encouragement, either overt or covert," *ibid.,* or when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar, supra,* at 941 (internal quotation marks omitted). We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," *Pennsylvania* v. *Board of Directors of City Trusts of Philadelphia,* 353 U. S. 230, 231 (1957) *(per curiam),* when it has been delegated a public function by the State, cf., *e. g., West* v. *Atkins, supra,* at 56; *Edmonson* v. *Leesville Concrete Co.,* 500 U. S. 614, 627–628 (1991), when it is "entwined with governmental policies," or when government is "entwined in [its] management or control," *Evans* v. *Newton,* 382 U. S. 296, 299, 301 (1966).

Amidst such variety, examples may be the best teachers, and examples from our cases are unequivocal in showing that the character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies. *Lebron* v. *National Railroad Passenger Corporation,* 513 U. S. 374 (1995), held that Amtrak was the Government for constitutional purposes, regardless of its congressional designation as private; it was organized under federal law to attain governmental objectives and was directed and controlled by federal appointees. *Pennsylvania* v. *Board of Directors of City Trusts of Philadelphia, supra,* held the privately endowed Girard College to be a state actor and enforcement of its private founder's limitation of admission

to whites attributable to the State, because, consistent with the terms of the settlor's gift, the college's board of directors was a state agency established by state law. Ostensibly the converse situation occurred in *Evans* v. *Newton, supra,* which held that private trustees to whom a city had transferred a park were nonetheless state actors barred from enforcing racial segregation, since the park served the public purpose of providing community recreation, and "the municipality remain[ed] entwined in [its] management [and] control," *id.,* at 301.

These examples of public entwinement in the management and control of ostensibly separate trusts or corporations foreshadow this case, as this Court itself anticipated in *Tarkanian.* *Tarkanian* arose when an undoubtedly state actor, the University of Nevada, suspended its basketball coach, Tarkanian, in order to comply with rules and recommendations of the National Collegiate Athletic Association (NCAA). The coach charged the NCAA with state action, arguing that the state university had delegated its own functions to the NCAA, clothing the latter with authority to make and apply the university's rules, the result being joint action making the NCAA a state actor.

To be sure, it is not the strict holding in *Tarkanian* that points to our view of this case, for we found no state action on the part of the NCAA. We could see, on the one hand, that the university had some part in setting the NCAA's rules, and the Supreme Court of Nevada had gone so far as to hold that the NCAA had been delegated the university's traditionally exclusive public authority over personnel. 488 U. S., at 190. But on the other side, the NCAA's policies were shaped not by the University of Nevada alone, but by several hundred member institutions, most of them having no connection with Nevada, and exhibiting no color of Nevada law. *Id.,* at 193. Since it was difficult to see the NCAA, not as a collective membership, but as surrogate for the one State, we held the organization's connection with Ne-

vada too insubstantial to ground a state-action claim. *Id.*, at 193, 196.

But dictum in *Tarkanian* pointed to a contrary result on facts like ours, with an organization whose member public schools are all within a single State. "The situation would, of course, be different if the [Association's] membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign." *Id.*, at 193, n. 13. To support our surmise, we approvingly cited two cases: *Clark* v. *Arizona Interscholastic Assn.*, 695 F. 2d 1126 (CA9 1982), cert. denied, 464 U. S. 818 (1983), a challenge to a state high school athletic association that kept boys from playing on girls' interscholastic volleyball teams in Arizona; and *Louisiana High School Athletic Assn.* v. *St. Augustine High School*, 396 F. 2d 224 (CA5 1968), a parochial school's attack on the racially segregated system of interscholastic high school athletics maintained by the athletic association. In each instance, the Court of Appeals treated the athletic association as a state actor.

B

Just as we foresaw in *Tarkanian*, the "necessarily fact-bound inquiry," *Lugar*, 457 U. S., at 939, leads to the conclusion of state action here. The nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it.

The Association is not an organization of natural persons acting on their own, but of schools, and of public schools to the extent of 84% of the total. Under the Association's bylaws, each member school is represented by its principal or a faculty member, who has a vote in selecting members of the governing legislative council and board of control from eligible principals, assistant principals, and superintendents.

Although the findings and prior opinions in this case include no express conclusion of law that public school officials act within the scope of their duties when they represent their institutions, no other view would be rational, the official nature of their involvement being shown in any number of ways. Interscholastic athletics obviously play an integral part in the public education of Tennessee, where nearly every public high school spends money on competitions among schools. Since a pickup system of interscholastic games would not do, these public teams need some mechanism to produce rules and regulate competition. The mechanism is an organization overwhelmingly composed of public school officials who select representatives (all of them public officials at the time in question here), who in turn adopt and enforce the rules that make the system work. Thus, by giving these jobs to the Association, the 290 public schools of Tennessee belonging to it can sensibly be seen as exercising their own authority to meet their own responsibilities. Unsurprisingly, then, the record indicates that half the council or board meetings documented here were held during official school hours, and that public schools have largely provided for the Association's financial support. A small portion of the Association's revenue comes from membership dues paid by the schools, and the principal part from gate receipts at tournaments among the member schools. Unlike mere public buyers of contract services, whose payments for services rendered do not convert the service providers into public actors, see *Rendell-Baker*, 457 U. S., at 839–843, the schools here obtain membership in the service organization and give up sources of their own income to their collective association. The Association thus exercises the authority of the predominantly public schools to charge for admission to their games; the Association does not receive this money from the schools, but enjoys the schools' moneymaking capacity as its own.

In sum, to the extent of 84% of its membership, the Association is an organization of public schools represented by their

officials acting in their official capacity to provide an integral element of secondary public schooling. There would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms. Only the 16% minority of private school memberships prevents this entwinement of the Association and the public school system from being total and their identities totally indistinguishable.

To complement the entwinement of public school officials with the Association from the bottom up, the State of Tennessee has provided for entwinement from top down. State Board members are assigned ex officio to serve as members of the board of control and legislative council, and the Association's ministerial employees are treated as state employees to the extent of being eligible for membership in the state retirement system.

It is, of course, true that the time is long past when the close relationship between the surrogate association and its public members and public officials acting as such was attested frankly. As mentioned, the terms of the State Board's Rule expressly designating the Association as regulator of interscholastic athletics in public schools were deleted in 1996, the year after a Federal District Court held that the Association was a state actor because its rules were "caused, directed and controlled by the Tennessee Board of Education," *Graham* v. *TSSAA*, No. 1:95–CV–044, 1995 WL 115890, *5 (ED Tenn., Feb. 20, 1995).[3]

---

[3] The District Court in *Graham* held that "[t]his delegation of authority to TSSAA by Tennessee, standing alone, is sufficient to make TSSAA a state actor" under the "state compulsion test," which it understood to provide that a State could exercise such coercive power or provide such significant encouragement, either overt or covert, that the choice of the private actor must be deemed to be that of the State as a matter of

But the removal of the designation language from Rule 0520–1–2–.08 affected nothing but words. Today the State Board's member-designees continue to sit on the Association's committees as nonvoting members, and the State continues to welcome Association employees in its retirement scheme. The close relationship is confirmed by the Association's enforcement of the same preamendment rules and regulations reviewed and approved by the State Board (including the recruiting Rule challenged by Brentwood), and by the State Board's continued willingness to allow students to satisfy its physical education requirement by taking part in interscholastic athletics sponsored by the Association. The most one can say on the evidence is that the State Board once freely acknowledged the Association's official character but now does it by winks and nods.[4] The amendment to the Rule in 1996 affected candor but not the "momentum" of the Association's prior involvement with the State Board. *Evans* v. *Newton*, 382 U. S., at 301. The District Court spoke to this point in finding that because of "custom and

---

law. 1995 WL 115890, at *4–*5 (citing *Blum* v. *Yaretsky*, 457 U. S. 991, 1004 (1982)).

[4] The significance of winks and nods in state-action doctrine seems to be one of the points of the dissenters' departure from the rest of the Court. In drawing the public-private action line, the dissenters would emphasize the formal clarity of the legislative action providing for the appointment of Girard College's trustees, see *supra*, at 296–297; *post*, at 310, in preference to our reliance on the practical certainty in this case that public officials will control operation of the Association under its bylaws. Similarly, the dissenters stress the express formality of the special statute defining Amtrak's ties to the Government, see *supra*, at 296; *post*, at 310, in contrast to the reality in this case that the Association's organizers structured the Association's relationships to the officialdom of public education. But if formalism were the *sine qua non* of state action, the doctrine would vanish owing to the ease and inevitability of its evasion, and for just that reason formalism has never been controlling. For example, a criterion of state action like symbiosis (which the dissenters accept, *post*, at 311) looks not to form but to an underlying reality.

practice," "the conduct of the parties has not materially changed" since 1996, "the connections between TSSAA and the State [being] still pervasive and entwined." 13 F. Supp. 2d, at 681.

The entwinement down from the State Board is therefore unmistakable, just as the entwinement up from the member public schools is overwhelming. Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards; entwinement to the degree shown here requires it.

C

Entwinement is also the answer to the Association's several arguments offered to persuade us that the facts would not support a finding of state action under various criteria applied in other cases. These arguments are beside the point, simply because the facts justify a conclusion of state action under the criterion of entwinement, a conclusion in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts.

The Association places great stress, for example, on the application of a public function test, as exemplified in *Rendell-Baker* v. *Kohn*, 457 U. S. 830 (1982). There, an apparently private school provided education for students whose special needs made it difficult for them to finish high school. The record, however, failed to show any tradition of providing public special education to students unable to cope with a regular school, who had historically been cared for (or ignored) according to private choice. It was true that various public school districts had adopted the practice of referring students to the school and paying their tuition, and no one disputed that providing the instruction aimed at a proper public objective and conferred a public benefit. But we held that the performance of such a public function did not permit a finding of state action on the part of the school unless the function performed was exclusively and tradition-

ally public, as it was not in that case. The Association argues that application of the public function criterion would produce the same result here, and we will assume, *arguendo*, that it would. But this case does not turn on a public function test, any more than *Rendell-Baker* had anything to do with entwinement of public officials in the special school.

For the same reason, it avails the Association nothing to stress that the State neither coerced nor encouraged the actions complained of. "Coercion" and "encouragement" are like "entwinement" in referring to kinds of facts that can justify characterizing an ostensibly private action as public instead. Facts that address any of these criteria are significant, but no one criterion must necessarily be applied. When, therefore, the relevant facts show pervasive entwinement to the point of largely overlapping identity, the implication of state action is not affected by pointing out that the facts might not loom large under a different test.

## D

This is not to say that all of the Association's arguments are rendered beside the point by the public officials' involvement in the Association, for after application of the entwinement criterion, or any other, there is a further potential issue, and the Association raises it. Even facts that suffice to show public action (or, standing alone, would require such a finding) may be outweighed in the name of some value at odds with finding public accountability in the circumstances. In *Polk County*, 454 U. S., at 322, a defense lawyer's actions were deemed private even though she was employed by the county and was acting within the scope of her duty as a public defender. Full-time public employment would be conclusive of state action for some purposes, see *West* v. *Atkins*, 487 U. S., at 50, accord, *Lugar*, 457 U. S., at 935, n. 18, but not when the employee is doing a defense lawyer's primary job; then, the public defender does "not ac[t] on behalf of the State; he is the State's adversary." *Polk County, supra*, at

323, n. 13. The state-action doctrine does not convert opponents into virtual agents.

The assertion of such a countervailing value is the nub of each of the Association's two remaining arguments, neither of which, however, persuades us. The Association suggests, first, that reversing the judgment here will somehow trigger an epidemic of unprecedented federal litigation. Brief for Respondents 35. Even if that might be counted as a good reason for a *Polk County* decision to call the Association's action private, the record raises no reason for alarm here. Save for the Sixth Circuit, every Court of Appeals to consider a statewide athletic association like the one here has found it a state actor. This majority view began taking shape even before *Tarkanian,* which cited two such decisions approvingly, see *supra,* at 298 (and this was six years after *Blum, Rendell-Baker,* and *Lugar,* on which the Sixth Circuit relied here). No one, however, has pointed to any explosion of § 1983 cases against interscholastic athletic associations in the affected jurisdictions. Not to put too fine a point on it, two District Courts in Tennessee have previously held the Association itself to be a state actor, see *Graham,* 1995 WL 115890, at *5; *Crocker* v. *Tennessee Secondary School Athletic Assn.,* 735 F. Supp. 753 (MD Tenn. 1990), affirmance order, 908 F. 2d 972, 973 (CA6 1990), but there is no evident wave of litigation working its way across the State. A reversal of the judgment here portends nothing more than the harmony of an outlying Circuit with precedent otherwise uniform.

Nor do we think there is anything to be said for the Association's contention that there is no need to treat it as a state actor since any public school applying the Association's rules is itself subject to suit under § 1983 or Title IX of the Education Amendments of 1972, 86 Stat. 373, 20 U. S. C. §§ 1681–1688. Brief for Respondents 30. If Brentwood's claim were pushing at the edge of the class of possible defendant state actors, an argument about the social utility of expand-

ing that class would at least be on point, but because we are nowhere near the margin in this case, the Association is really asking for nothing less than a dispensation for itself. Its position boils down to saying that the Association should not be dressed in state clothes because other, concededly public actors are; that Brentwood should be kept out of court because a different plaintiff raising a different claim in a different case may find the courthouse open. Pleas for special treatment are hard to sell, although saying that does not, of course, imply anything about the merits of Brentwood's complaint; the issue here is merely whether Brentwood properly names the Association as a § 1983 defendant, not whether it should win on its claim.

The judgment of the Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

We have never found state action based upon mere "entwinement." Until today, we have found a private organization's acts to constitute state action only when the organization performed a public function; was created, coerced, or encouraged by the government; or acted in a symbiotic relationship with the government. The majority's holding—that the Tennessee Secondary School Athletic Association's (TSSAA) enforcement of its recruiting rule is state action—not only extends state-action doctrine beyond its permissible limits but also encroaches upon the realm of individual freedom that the doctrine was meant to protect. I respectfully dissent.

I

Like the state-action requirement of the Fourteenth Amendment, the state-action element of 42 U. S. C. § 1983 excludes from its coverage "merely private conduct, however

discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U. S. 40, 50 (1999) (internal quotation marks omitted). "Careful adherence to the 'state action' requirement" thus "preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar* v. *Edmondson Oil Co.,* 457 U. S. 922, 936 (1982). The state-action doctrine also promotes important values of federalism, "avoid[ing] the imposition of responsibility on a State for conduct it could not control." *National Collegiate Athletic Assn.* v. *Tarkanian,* 488 U. S. 179, 191 (1988). Although we have used many different tests to identify state action, they all have a common purpose. Our goal in every case is to determine whether an action "can fairly be attributed to the State." *Blum* v. *Yaretsky,* 457 U. S. 991, 1004 (1982); *American Mfrs., supra,* at 52.

## A

Regardless of these various tests for state action, common sense dictates that the TSSAA's actions cannot fairly be attributed to the State, and thus cannot constitute state action. The TSSAA was formed in 1925 as a private corporation to organize interscholastic athletics and to sponsor tournaments among its member schools. Any private or public secondary school may join the TSSAA by signing a contract agreeing to comply with its rules and decisions. Although public schools currently compose 84% of the TSSAA's membership, the TSSAA does not require that public schools constitute a set percentage of its membership, and, indeed, no public school need join the TSSAA. The TSSAA's rules are enforced not by a state agency but by its own board of control, which comprises high school principals, assistant principals, and superintendents, none of whom must work at a public school. Of course, at the time the recruiting rule was enforced in this case, all of the board members happened to be public school officials. However, each board member acts in

a representative capacity on behalf of all the private and public schools in his region of Tennessee, and not simply his individual school.

The State of Tennessee did not create the TSSAA. The State does not fund the TSSAA and does not pay its employees.[1] In fact, only 4% of the TSSAA's revenue comes from the dues paid by member schools; the bulk of its operating budget is derived from gate receipts at tournaments it sponsors. The State does not permit the TSSAA to use state-owned facilities for a discounted fee, and it does not exempt the TSSAA from state taxation. No Tennessee law authorizes the State to coordinate interscholastic athletics or empowers another entity to organize interscholastic athletics on behalf of the State.[2] The only state pronouncement ac-

---

[1] Although the TSSAA's employees, who typically are retired teachers, are allowed to participate in the state retirement system, the State does not pay any portion of the employer contribution for them. The TSSAA is one of three private associations, along with the Tennessee Education Association and the Tennessee School Boards Association, whose employees are statutorily permitted to participate in the state retirement system. Tenn. Code Ann. § 8–35–118 (1993).

[2] The first formal state acknowledgment of the TSSAA's existence did not occur until 1972, when the State Board of Education passed a resolution stating that it "recognizes and designates [the TSSAA] as the organization to supervise and regulate the athletic activities in which the public junior and senior high schools of Tennessee participate in on an interscholastic basis." App. 211. There is no indication that the TSSAA invited this resolution or that the resolution in any way altered the actions of the TSSAA or the State following its adoption in 1972. In fact, it appears that the resolution was not entirely accurate: The TSSAA does not supervise or regulate regular season interscholastic contests. In any event, the resolution was revoked in 1996. Contrary to the majority's reference to its revocation as being "winks and nods," ante, at 301, the repeal of the 1972 resolution appears to have had no more impact on the TSSAA's operation than did its passage.

The majority also cites this resolution to support its assertion that "[e]ver since the Association was incorporated in 1925, Tennessee's State Board of Education . . . has acknowledged the corporation's function 'in

knowledging the TSSAA's existence is a rule providing that the State Board of Education permits public schools to maintain membership in the TSSAA if they so choose.[3]

Moreover, the State of Tennessee has never had any involvement in the particular action taken by the TSSAA in this case: the enforcement of the TSSAA's recruiting rule prohibiting members from using "undue influence" on students or their parents or guardians "to secure or to retain a student for athletic purposes." App. 115. There is no indication that the State has ever had any interest in how schools choose to regulate recruiting.[4] In fact, the TSSAA's authority to enforce its recruiting rule arises solely from the voluntary membership contract that each member school signs, agreeing to conduct its athletics in accordance with the rules and decisions of the TSSAA.

## B

Even approaching the issue in terms of any of the Court's specific state-action tests, the conclusion is the same: The TSSAA's enforcement of its recruiting rule against Brentwood Academy is not state action. In applying these tests,

---

providing standards, rules and regulations for interscholastic competition in the public schools of Tennessee.'" *Ante*, at 292. However, there is no evidence in the record that suggests that the State of Tennessee or the State Board of Education had any involvement or interest in the TSSAA prior to 1972.

[3] The Rule provides: "The State Board of Education recognizes the value of participation in interscholastic athletics and the role of the Tennessee Secondary School Athletic Association in coordinating interscholastic athletic competition. The State Board of Education authorizes the public schools of the state to voluntarily maintain membership in the Tennessee Secondary School Athletic Association." Tenn. Comp. Rules & Regs. § 0520–1–2–.08(1) (2000).

[4] The majority relies on the fact that the TSSAA permits members of the State Board of Education to serve ex officio on its board of control to support its "top-down" theory of state action. But these members are not voting members of the TSSAA's board of control and thus cannot exert any control over its actions.

courts of course must place the burden of persuasion on the plaintiff, not the defendant, because state action is an element of a § 1983 claim. *American Mfrs.,* 526 U. S., at 49–50; *West* v. *Atkins,* 487 U. S. 42, 48 (1988).

The TSSAA has not performed a function that has been "traditionally exclusively reserved to the State." *Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345, 352 (1974). The organization of interscholastic sports is neither a traditional nor an exclusive public function of the States. Widespread organization and administration of interscholastic contests by schools did not begin until the 20th century. See M. Lee, A History of Physical Education and Sports in the U. S. A. 73 (1983) (explaining that what little interscholastic athletics there was in the 19th century "came almost entirely in the closing decade of the century and was largely pupil inspired, pupil controlled, and pupil coached"); *id.,* at 68, 146 (stating that no control of high school sports occurred until 1896, when a group of teachers in Wisconsin set up a committee to control such contests, and pointing out that "[i]t was several years before the idea caught on in other states"). Certainly, in Tennessee, the State did not even show an interest in interscholastic athletics until 47 years after the TSSAA had been in existence and had been orchestrating athletic contests throughout the State. Even then, the State Board of Education merely acquiesced in the TSSAA's actions and did not assume the role of regulating interscholastic athletics. Cf. *Blum,* 457 U. S., at 1004–1005 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives . . ."); see also *Flagg Bros., Inc.* v. *Brooks,* 436 U. S. 149, 164–165 (1978). The TSSAA no doubt serves the public, particularly the public schools, but the mere provision of a service to the public does not render such provision a traditional and exclusive public function. See *Rendell-Baker* v. *Kohn,* 457 U. S. 830, 842 (1982).

It is also obvious that the TSSAA is not an entity created and controlled by the government for the purpose of fulfilling a government objective, as was Amtrak in *Lebron v. National Railroad Passenger Corporation*, 513 U. S. 374, 394 (1995). See also *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U. S. 230 (1957) *(per curiam)* (holding that a state agency created under state law was a state actor). Indeed, no one claims that the State of Tennessee played any role in the creation of the TSSAA as a private corporation in 1925. The TSSAA was designed to fulfill an objective—the organization of interscholastic athletic tournaments—that the government had not contemplated, much less pursued. And although the board of control currently is composed of public school officials, and although public schools currently account for the majority of the TSSAA's membership, this is not required by the TSSAA's constitution.

In addition, the State of Tennessee has not "exercised coercive power or . . . provided such significant encouragement [to the TSSAA], either overt or covert," *Blum*, 457 U. S., at 1004, that the TSSAA's regulatory activities must in law be deemed to be those of the State. The State has not promulgated any regulations of interscholastic sports, and nothing in the record suggests that the State has encouraged or coerced the TSSAA in enforcing its recruiting rule. To be sure, public schools do provide a small portion of the TSSAA's funding through their membership dues, but no one argues that these dues are somehow conditioned on the TSSAA's enactment and enforcement of recruiting rules.[5]

---

[5] The majority emphasizes that public schools joining the TSSAA "give up sources of their own income to their collective association" by allowing the TSSAA "to charge for admission to their games." *Ante*, at 299. However, this would be equally true whenever a State contracted with a private entity: The State presumably could provide the same service for profit, if it so chose. In *Rendell-Baker v. Kohn*, 457 U. S. 830 (1982), for example, the State could have created its own school for students with special needs and charged for admission. Or in *Blum v. Yaretsky*, 457

Likewise, even if the TSSAA were dependent on state funding to the extent of 90%, as was the case in *Blum,* instead of less than 4%, mere financial dependence on the State does not convert the TSSAA's actions into acts of the State. See *Blum, supra,* at 1011; *Rendell-Baker, supra,* at 840; see also *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 173 (1972) ("The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State . . ."). Furthermore, there is no evidence of "joint participation," *Lugar,* 457 U. S., at 941–942, between the State and the TSSAA in the TSSAA's enforcement of its recruiting rule. The TSSAA's board of control enforces its recruiting rule solely in accordance with the authority granted to it under the contract that each member signs.

Finally, there is no "symbiotic relationship" between the State and the TSSAA. *Moose Lodge, supra,* at 175; cf. *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961). Contrary to the majority's assertion, see *ante,* at 299–300, the TSSAA's "fiscal relationship with the State is not different from that of many contractors performing services for the government." *Rendell-Baker, supra,* at 843. The TSSAA provides a service—the organization of athletic tournaments—in exchange for membership dues and gate fees, just as a vendor could contract with public schools to sell refreshments at school events. Certainly the public school could sell its own refreshments, yet the existence of that option does not transform the service performed by the contractor into a state action. Also, there is no suggestion in this case that, as was the case in *Burton,* the State profits from the TSSAA's decision to enforce its recruiting rule.

<hr>

U. S. 991 (1982), the State could have created its own nursing homes and charged individuals to stay there. The ability of a State to make money by performing a service it has chosen to buy from a private entity is hardly an indication that the service provider is a state actor.

Because I do not believe that the TSSAA's action of enforcing its recruiting rule is fairly attributable to the State of Tennessee, I would affirm.

## II

Although the TSSAA's enforcement activities cannot be considered state action as a matter of common sense or under any of this Court's existing theories of state action, the majority presents a new theory. Under this theory, the majority holds that the combination of factors it identifies evidences "entwinement" of the State with the TSSAA, and that such entwinement converts private action into state action. *Ante*, at 296–297. The majority does not define "entwinement," and the meaning of the term is not altogether clear. But whatever this new "entwinement" theory may entail, it lacks any support in our state-action jurisprudence. Although the majority asserts that there are three examples of entwinement analysis in our cases, there is no case in which we have rested a finding of state action on entwinement alone.

Two of the cases on which the majority relies do not even use the word "entwinement." See *Lebron* v. *National Railroad Passenger Corporation, supra; Pennsylvania* v. *Board of Directors of City Trusts of Philadelphia, supra.* *Lebron* concerned the status of Amtrak, a corporation that Congress created and placed under Government control for the specific purpose of achieving a governmental objective (namely, to avert the threatened extinction of passenger train service in the United States). 513 U. S., at 383, 386. Without discussing any notion of entwinement, we simply held that, when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.*, at 400. Similarly, in

*City Trusts*, we did not consider entwinement when we addressed the question whether an agency established by state law was a state actor. See 353 U. S., at 231. In that case, the Pennsylvania Legislature passed a law creating a board of directors to operate a racially segregated school for orphans. *Ibid.* Without mentioning "entwinement," we held that, because the board was a state agency, its actions were attributable to the State. *Ibid.*

The majority's third example, *Evans* v. *Newton*, 382 U. S. 296 (1966), lends no more support to an "entwinement" theory than do *Lebron* and *City Trusts*. Although *Evans* at least uses the word "entwined," 382 U. S., at 299 ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action"), we did not discuss entwinement as a distinct concept, let alone one sufficient to transform a private entity into a state actor when traditional theories of state action do not. On the contrary, our analysis rested on the recognition that the subject of the dispute, a park, served a "public function," much like a fire department or a police department. *Id.*, at 302. A park, we noted, is a "public facility" that "serves the community." *Id.*, at 301–302. Even if the city severed all ties to the park and placed its operation in private hands, the park still would be "municipal in nature," analogous to other public facilities that have given rise to a finding of state action: the streets of a company town in *Marsh* v. *Alabama*, 326 U. S. 501 (1946), the elective process in *Terry* v. *Adams*, 345 U. S. 461 (1953), and the transit system in *Public Util. Comm'n of D. C.* v. *Pollak*, 343 U. S. 451 (1952). 382 U. S., at 301–302. Because the park served public functions, the private trustees operating the park were considered to be state actors.[6]

---

[6] We have used the word "entwined" in another case, *Gilmore* v. *Montgomery*, 417 U. S. 556, 565 (1974), which the majority does not cite. In *Gilmore*, we held that a city could not grant exclusive use of public facili-

These cases, therefore, cannot support the majority's "entwinement" theory. Only *Evans* speaks of entwinement at all, and it does not do so in the same broad sense as does the majority.[7] Moreover, these cases do not suggest that the TSSAA's activities can be considered state action, whether the label for the state-action theory is "entwinement" or anything else.

\*     \*     \*

Because the majority never defines "entwinement," the scope of its holding is unclear. If we are fortunate, the majority's fact-specific analysis will have little bearing beyond this case. But if the majority's new entwinement test develops in future years, it could affect many organizations that foster activities, enforce rules, and sponsor extracurricular competition among high schools—not just in athletics, but in such diverse areas as agriculture, mathematics, music, marching bands, forensics, and cheerleading. Indeed, this entwinement test may extend to other organizations that are composed of, or controlled by, public officials or public entities, such as firefighters, policemen, teachers, cities, or coun-

---

ties to racially segregated groups. *Id.*, at 566. The city, we determined, was "engaged in an elaborate subterfuge" to circumvent a court order desegregating the city's recreational facilities. *Id.*, at 567. The grant of exclusive authority was little different from a formal agreement to run a segregated recreational program. *Ibid.* Thus, although we quoted the "entwined" language from *Evans* v. *Newton*, 382 U. S. 296 (1966), we were not using the term in the same loose sense the majority uses it today. And there is certainly no suggestion that the TSSAA has structured its recruiting rule specifically to evade review of an activity that previously was deemed to be unconstitutional state action.

[7] The majority's reference to *National Collegiate Athletic Assn.* v. *Tarkanian*, 488 U. S. 179 (1988), as foreshadowing this case, *ante*, at 297–298, also does not support its conclusion. Indeed, the reference to *Tarkanian* is ironic because it is not difficult to imagine that application of the majority's entwinement test could change the result reached in that case, so that the National Collegiate Athletic Association's actions could be found to be state action given its large number of public institution members that virtually control the organization.

ties. I am not prepared to say that any private organization that permits public entities and public officials to participate acts as the State in anything or everything it does, and our state-action jurisprudence has never reached that far. The state-action doctrine was developed to reach only those actions that are truly attributable to the State, not to subject private citizens to the control of federal courts hearing § 1983 actions.

I respectfully dissent.