State of OREGON, By and Through its DEPARTMENT OF TRANSPORTATION, and Grace Crunican, Director, Oregon Department of Transportation, Plaintiffs,

v.

HEAVY VEHICLE ELECTRONIC LICENSE PLATE, INC., an Arizona Corporation, Defendant.

No. Civ. 01–6066–TC.

United States District Court, D. Oregon.

April 19, 2002.

David E. Leith, Department of Justice, Salem, OR, Julie Smith, Department of Justice, Salem, OR, Paul A. Graham, Department of Justice–General Counsel, Salem, OR, for plaintiffs.

David Wade, Doyle Gartland Nelson McCleery & Wade, PC, Eugene, OR, Rodney F. Page, Bryan Cave, Washington, DC, LLP, for defendant.

## ORDER

COFFIN, United States Magistrate Judge.

Plaintiffs have filed a complaint under 28 U.S.C. § 1331, 42 U.S.C. § 1983, and Article I, Section 8 of the United States Constitution, seeking a declaratory judgment and injunctive relief against defendant. Presently before the court is plaintiffs' motion for summary judgment (# 41) and defendant's cross-motion for summary judgment (# 51).

### *FACTUAL BACKGROUND*

Heavy Vehicle Electronic License Plate, Inc. ("HELP"), is a non-profit corporation that operates a multi-state electronic "highway screening system" known as "PrePass." Essentially, the PrePass system works as follows: a carrier enters into an agreement with HELP to take part in the PrePass system. HELP provides a transponder to the trucker, which, when prompted by a transceiving station, emits a low-level radio signal identifying the truck. Information about the truck, such as its height, weight, licenses and permits, is stored in various computers throughout the states in which PrePass operates. As the truck approaches a weigh station, border crossing, or other traditional regulatory stop location, PrePass receivers detect the signal sent by the truck's transponder, and information about the truck is accessed. If everything is in order, the Pre-Pass receiver returns a signal to the truck which is displayed to the driver, and the driver continues on without stopping. The carrier is charged 99 cents each time one of its trucks successfully passes a PrePass station. The convenience and efficiency offered by this sort of system is obvious, and at present over 150 sites and more than 170,000 trucks utilize the PrePass system, which operates in 22 states.

The State of Oregon, through the Oregon Department of Transportation, operates a similar system called the Green Light Program ("Green Light"). Green Light and PrePass are similar enough that each system can interact with transponders issued by the other; i.e., carriers enrolled in Green Light can transmit the appropriate signals to PrePass receivers, and vice versa. The two systems are thus "technically interoperable." However, the methods by which funds are received by each program are quite different: while PrePass charges carriers on a per-use basis, Green Light charges users an annual enrollment fee.[1]

The State of Oregon, motivated by a desire to maximize efficiency, wants to allow carriers who use HELP-issued transponders to enroll in Green Light, using the HELP transponder to identify the trucks that pass Oregon Green Light stations.[2] HELP, however, has inserted a provision in its contracts with carriers forbidding the carriers from using its transponders in non-HELP systems, absent advance approval from HELP. The parties have been unable to reach a mutually satisfactory agreement that would resolve this issue.

---

1. Presently $35.00 per year.

2. State of Oregon used to do exactly that; however, a cease and desist letter sent by HELP caused them to stop enrolling HELP-issued transponders, and ultimately led it to file the instant action.

The major problems that have made it difficult for the parties to negotiate a solution relate to (1) the differences in revenue generation and (2) a difference in the availability of the information processed during a bypass. PrePass, to protect its investment in transponders, receivers and related infrastructure, requires all PrePass carriers to utilize the HELP-issued transponder only at PrePass receiving stations, where they can collect the 99 cent fee. Oregon, on the other hand, freely allows carriers to use Green Light transponders in the PrePass program as well as in any other technically interoperable preclearance system if the carriers so desire; Oregon charges only an annual fee for carriers who are issued a transponder. The parties' positions on the use of information received by a transceiving station at a bypass event are equally divergent: HELP specifically informs carriers who enroll with it that no information collected by HELP will be used for anything other than the bypass event itself, while Oregon allows the information collected at a bypass event to be used in the same way as information in a traditional weigh station logbook would be.[3]

Plaintiffs thus filed the instant action seeking a declaration from the court that, should they honor carrier requests to enroll a HELP-issued transponder in the Green Light program, such action would not be in violation of the law. Specifically, plaintiffs pray that the court:

(1) Declare that the Oregon Department of Transportation ("ODOT") may enroll, receive information from, and respond to electronic license plate transponders issued by HELP without violating the federal Wireless Telephone Protection Act[4] or any other federal or state statutes or regulations;

(2) Declare that ODOT may enroll, receive information from, and respond to electronic license plate transponders issued by HELP without committing misappropriation, conversion, tortious interference with an economic relationship, or any other tort;

(3) Declare that any contractual provision between HELP and its participating states or carriers that frustrates interoperability of electronic license plates constitutes an undue burden on interstate commerce, in violation of Article I, section 8 of the United States Constitution; and

(4) Issue preliminary and permanent injunctions preventing HELP from enforcing the provision in its licensing agreement that purports to require carriers to use HELP-supplied transponders "only for the PrePass program ... or for other uses that have been authorized in writing by HELP."

The parties have now moved for summary judgment.

---

**3.** Thus, in Green Light, information about what vehicle passed which weigh station at what time is available to the state for use in furtherance of its regulatory goals. In a HELP preclearance event, the information surrounding the bypass event is not provided to the participating states. Presumably, HELP does keep a record of the events in some fashion, for billing and other internal administrative purposes. However, its licensing agreement states that it discards such

information after payment of the bypass transaction charges.

**4.** Plaintiffs correctly noted during oral argument that the statutory provisions at issue, 18 U.S.C. § 1029(a)(2) and possibly (a)(3), are actually part of the Credit Card Fraud Act. Other provisions of § 1029(a) were added later as part of the Wireless Telephone Protection Act, but those provisions are not implicated here.

## STANDARD OF REVIEW

 Declaratory relief is an equitable remedy, whose distinctive characteristic is that it allows adjudication of the parties' rights and obligations on a matter in dispute regardless of whether claims for damages or injunctive relief have yet arisen: "In effect, it brings to the present a litigable controversy which otherwise might only be tried in the future." *Societe de Conditionnement v. Hunter Eng. Co., Inc.,* 655 F.2d 938, 943 (9th Cir.1981). The party seeking declaratory relief must show that an actual controversy exists; this requirement is the same as the "case or controversy" requirement of Article III of the United States Constitution. *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In the absence of a true "case or controversy", the court would be issuing an unconstitutional advisory opinion. *Id.* at 240, 57 S.Ct. 461.[5] The threshold is met if the party seeking relief can show that the dispute is of sufficient "immediacy and reality" to constitute a "controversy" in the constitutional sense, *id.,* but there is no subject matter jurisdiction to grant relief as to rights or liabilities that do not yet exist or are not certain to arise. *Calderon v. Ashmus,* 523 U.S. 740, 746–747, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998). *See also Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *Hillblom v. United States,* 896 F.2d 426, 430 (9th Cir.1990).

 Even if the party seeking relief can establish that the court has jurisdiction and that an actual case or controversy is presented, the court still has discretion to decline to entertain the action. "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995).

## DISCUSSION

### I. *The Credit Card Fraud Act and "any other federal or state statutes or regulations."*

Plaintiffs seek a declaration that their proposed action of honoring carrier requests to enroll HELP-issued transponders in Green Light would not violate the Credit Card Fraud Act or "any other federal or state statutes or regulations."

 As an initial matter, the court notes that it will decline to issue declaratory relief on as broad a basis as plaintiffs desire. Granting a declaration that conduct does not violate *any* federal or state statutes—especially when the parties have not specifically addressed the merits of potentially implicated statutes—would be imprudent. The court cannot be expected to be prescient. The only statute that was thoroughly briefed by the parties was the Credit Card Fraud Act, codified at 18 U.S.C. § 1029, specifically sections (a)(2) and (3).[6]

 The court has considered the arguments of the parties, and has decided that the appropriate course of action is to decline to exercise declaratory relief jurisdic-

---

5. Holding that federal courts have no power to render opinions as to what the law ought to be or affecting a dispute that has not yet arisen.

6. Stating that "Whoever ... (2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period; [or] (3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices ... shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section."

tion on this question. The Credit Card Fraud Act is a criminal statute, and the court is unwilling to declare a potential course of conduct as not in violation of it, especially in the absence of briefing from the U.S. Department of Justice, which would prosecute any such offense. HELP has no authority to file federal criminal charges, and what plaintiffs seek is an advisory opinion regarding criminal statutes that would not be binding in any event upon the United States, a non-party to this action. Plaintiffs' request for a declaration that their proposed conduct does not violate the Credit Card Fraud Act or any other federal or state statute or regulation is denied.

## II. *The torts.*

■ Again, plaintiffs seek an order from this court that is wider than wise judicial administration would allow for, and beyond the scope of a true case or controversy. The court declines to extend an order immunizing plaintiffs from suit on any and all tort theories.

■ The parties did spend considerable time briefing the tort of intentional interference with economic relations, however, and it is appropriate to discuss that specific tort here.[7]

■ In Oregon, liability for the tort of intentional interference with economic relations is contingent on the establishment of six elements:

(1) the existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through

improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

*McGanty v. Staudenraus,* 321 Or. 532, 535, 901 P.2d 841 (1995). Plaintiffs state that "[t]he burden of proof rests with HELP to show both that Oregon 'intentionally interfered' with its economic relationship and had no privilege to do so." Plaintiffs' Memorandum (# 42) at 11 (citing *McGanty*). They further assert that their proposed action would not be an "improper means" nor for an "improper purpose," and that Oregon would not be the "cause" of any breach. Finally, they assert that their conduct is privileged and that HELP's licensing agreement violates public policy.

First, the court is unwilling to rule that as a matter of Oregon law plaintiffs' proposed conduct would not utilize an "improper means" or that it would not be done for an "improper purpose." While the court acknowledges plaintiffs' position that the purpose of their enrolling carriers who request it is to facilitate commerce and maximize efficiency, and that they do not have the specific purpose of "inflicting injury" on HELP, *Northwest Natural Gas Co. v. Chase Gardens, Inc.,* 328 Or. 487, 982 P.2d 1117 (1999), it is nonetheless apparent that defendant may be able to convince a jury that plaintiffs' position is less admirable. There is no dispute that plaintiffs would be receiving the benefit of HELP-supplied transponders without paying for the construction and distribution of them; it is not inconceivable that a jury could find that a substantial purpose of plaintiffs is to receive an economic benefit

---

7. The parties also brief misappropriation and conversion theories, but because it appears that Oregon law is unsettled on the availability and applicability of these torts, the court will decline to exercise declaratory relief jurisdiction. "Absent a strong countervailing federal interest, the federal court should not elbow its way ... to render what may be an 'uncertain' and 'ephemeral' interpretation of state law." *Mitcheson v. Harris,* 955 F.2d 235, 238 (4th Cir.1992).

at HELP's expense. Further, the details of the means employed could be important to a factfinder, and due to the very nature of this action the court cannot have all the potentially important details at its disposal. For example: how did plaintiffs let carriers know about the fact that they can request to enroll? What was told to carriers who expressed an interest? Was HELP notified when a carrier was enrolled, and if so, how? What, if any, coordination took place between plaintiffs and HELP when a carrier was enrolled? These facts, and countless others that could prove important, cannot be known in advance, and in their absence the court cannot say whether either party would be entitled to judgment as a matter of law.

The issue of whether HELP's licensing agreement should be declared void as against public policy, thus eliminating the very basis for a potential tortious interference claim by HELP, requires additional comment.

The provisions in the licensing agreement that have been identified as allegedly void relate to the two fundamental issues in the parties' dispute: the privacy clause [8] and the clause restricting the use of HELP-supplied transponders.[9]

If the only contractual provision at issue were the privacy clause, HELP's refusal to let plaintiffs use the data received *could* be found to be void as against public policy. Oregon has a strong regulatory interest in utilizing weigh station stop (or bypass, in this case) data, and in any event the privacy interests at issue are those of the carriers, not HELP. In that Oregon intends to enlist carriers into its system on a voluntary basis, HELP could not assert the contractual privacy clause to bar carriers from enlisting in Green Light; the clause is intended to confer a benefit on the carrier—not HELP. Thus, any privacy interest may be waived at the carriers' option.[10]

However, the contract between the carriers and HELP establishes an economic relationship between those parties that provides benefits to each; the carriers save money and time, and HELP receives a fee for each bypass event. To protect its investment, HELP included the use restriction clause in its licensing agreement. The fee charged, and the restriction clause that protects HELP's ability to charge such a fee whenever its technology is used, are critical components of the agreement.[11] This part of the contract cannot be said to be void as against public policy, notwith-

---

8. "It is the policy of HELP to preserve bypass transaction data and all carrier business information with the utmost confidence. Truck-specific transaction data is used in PrePass only for the purpose of managing the bypass events. Such data is not publicly disclosed and is not permanently retained after payment of the relevant transaction fees." Licensing Agreement, ¶ 14.

9. "HELP supplied transponders are the property of HELP and Customer may use HELP supplied transponders only for the PrePass program, GatePass installations or other uses that have been authorized in writing by HELP." Licensing Agreement, ¶ 5.

10. I do not mean to imply that the privacy clause would preclude Oregon from using bypass transaction data in furtherance of other regulatory goals should Oregon change to a mandatory electronic license plate system and enlist carriers by other than voluntary means. That issue is not before the court.

11. The court recognizes that HELP cannot currently charge a fee in Oregon, because Oregon does not have HELP-sponsored bypass stations. However, the restriction clause protects HELP's investment by ensuring that an outside entity—such as Oregon—must negotiate an agreeable fee for use of HELP transponders. This fee may amount to less than the 99 cents per bypass event charged at HELP sponsored stations, if, for example, the outside entity provided part of the infrastructure; the actual amount of any such fee would, of course, need to be negotiated between the parties. However, it is clear that if

standing Oregon's asserted general policy that intelligent transportation systems should be freely interoperable. That Oregon has a general policy that anybody should be able to utilize transponder transmissions does not mean that the state has a right to deny HELP the agreed-upon benefits of its bargain; and if Oregon's policy is so fundamental to its legitimate interests that it does encompass such a right, the court would expect to see a clearer establishment of the policy—as well as a justification of its critical importance—from the Oregon legislature.[12]

Finally, as discussed in the next section, plaintiffs' argument that the contract should be declared void as an undue burden on interstate commerce is unsuccessful, primarily because HELP is not a state actor. Plaintiffs' request for a declaratory judgment that its proposed action would not constitute misappropriation, conversion, tortious interference with an economic relationship, or any other tort is denied.

### III. The undue burden on interstate commerce argument.

Plaintiffs assert, under 42 U.S.C. § 1983 and Article I, section 8 of the United States Constitution, that the agreements[13] between defendant and the participating carriers constitute an undue burden on interstate commerce.

A threshold issue on this argument is the question of whether HELP is a "state actor." I hold that it is not.

The case of *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) is the most on point of any of the cases cited by the parties. In *Tarkanian*, the Court had to decide if the recommendations of the National Collegiate Athletic Association ("NCAA"), followed by the University of Nevada at Las Vegas ("UNLV"), constituted state action. The Court found that they did not, because, *inter alia*, the NCAA did not have the ability to require UNLV to take the recommended action and the NCAA was an organization composed of many state and private entity members, not just public Nevada institutions. The relationship of the NCAA to the state actors it provided recommendations to is similar to that of HELP to its member states. HELP is an organization with many members shaping its policies, including representatives from the states in which it operates bypass sites and from private industry. It provides certain services to its member states, but nothing in the record before the court suggests to the court that HELP actually makes policy or has taken over the regulatory responsibilities of its state members.[14] The states

---

*all* outside entities were allowed free use of the HELP-issued transponder, HELP would be deprived of a very significant potential source of revenue. Moreover, HELP's transponders could be used, without its permission, in other ways as well: states with toll roads, for example, could allow carriers to prepay a negotiated annual toll fee and use HELP transponder signals to bypass HELP carriers around toll stations. It is most dubious that HELP's contractual provisions, designed to protect its proprietary interest in its technology, is void as against public policy.

12. Electronic license plates ("ELPs") are not mandatory at this time. The system has not developed to the point where ELPs can be

substituted for tin license plates, which are required in every jurisdiction. This case would necessitate a different analysis if ELPs were statutorily required and HELP was threatening legal action to bar participation by its carriers.

13. Specifically the "use restriction" clause.

14. *Compare Lee v. Katz*, 276 F.3d 550 (9th Cir.2002), where the regulation of free speech was specifically delegated from the City of Portland to a private lessee, providing the Ninth Circuit with a basis to find that the lessee's regulation of speech, pursuant to that delegation, could be state action.

that participate are supported in their regulatory mission by HELP, and may choose to reduce their own regulatory enforcement infrastructure as a result of HELP's performance. However, the states are not delegating such of their regulatory responsibilities to HELP that a licensing agreement entered into between HELP and a private carrier (intended to spell out the terms of how a HELP-issued transponder will be used and what charges will be associated with such use) can be seen as an agreement between the carrier and the member states themselves. While HELP's activities support states' regulatory missions, they do not replace them.[15]

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,* 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) is easily distinguished. There, the state-wide athletic association was an entity composed exclusively of Tennessee school representatives, primarily representatives from the state's public schools. Because of the "pervasive entwinement" of public school officials—clearly state actors in their own right—in the structure of the organization, and the fact that the organization had historically regulated state high school athletics in lieu of the state Board of Education, the Court held the association's regulatory activity constituted state action. Neither of these facts are in line with the circumstances of the instant action. HELP is an entity composed of public and private officials from many states and it has not assumed the regulatory authority of any of its state members. HELP, like the NCAA and in contrast to the Tennessee school athletic association, is not a state actor.[16]

Because HELP is not a state actor, plaintiffs' request for a declaration that its agreements with its carriers are void as an undue burden on interstate commerce must be denied.

### IV. *Injunctive relief.*

For all the above stated reasons, there is no basis to provide plaintiffs with their requested injunctive relief. Plaintiff's request for injunctive relief is, therefore, denied.

### CONCLUSION

Plaintiffs' motion for summary judgment (# 41) is denied. Inasmuch as it requests the denial of plaintiffs' requested declarations and relief, defendant's cross-motion for summary judgment (# 51) is granted. The court declines to issue a declaratory judgment in favor of either party. This action is hereby dismissed.

---

**15.** *See also Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (private school not state actor even though it performed under public contract—the school was "not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Id.* at 841, 102 S.Ct. 2764.).

**16.** In addition, because of the wholly voluntary nature of electronic licensing, it is difficult to see HELP's objections to Oregon's unnegotiated use of HELP-supplied transponders as an "undue burden" on interstate commerce. Nationally, approximately 95% of commercial trucks do not have ELPs, and thus must physically stop at weigh stations. That trucks with HELP transponders must also stop at Oregon weigh stations unless they use a Green Light transponder would not seem to create an undue burden on commerce under these circumstances.