Brian **JENKINS**, Plaintiff,

v.

**AREA COOPERATIVE EDUCATION SERVICES, et al., Defendants.**

**No. CIV.A.3:99CV2371(CFD).**

United States District Court,
D. Connecticut.

March 10, 2003.

John R. Williams, Dawne Westbrook, David G. Toro, Williams & Pattis, New Haven, CT, for plaintiff.

James M. Sconzo, Jonathan C. Sterling, Halloran & Sage, Hartford, CT, Michael Peter McKeon, Sullivan, Schoen, Campane & Connon, Hartford, CT, Michelle L. Treadwell, Fairfield, CT, for defendants.

### RULING ON DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

DRONEY, District Judge.

The plaintiff, Brian Jenkins ("Jenkins"), filed this action in the Connecticut Superior Court against Area Cooperative Educational Services ("ACES"), its Executive Director Peter C. Young, and its Deputy Executive Director Cheryl S. Saloom. It was removed to this Court pursuant to 28 U.S.C. § 1446.[1]

The complaint contains five counts asserted against all three defendants. Count one alleges that by discharging Jenkins from his employment with ACES the defendants violated his right to equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. Count two asserts that the discharge deprived Jenkins of "procedural due process of law" also in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. Count three asserts a claim of negligent infliction of emotional distress under Connecticut law arising out of Jenkins' termination. Count four alleges that the termination constituted a breach of the implied covenant of good faith and fair dealing. Finally, count five asserts a state law claim of intentional infliction of emotional distress.

Previously, this Court denied the defendants' Motion to Dismiss and Motion for Summary Judgment without prejudice to the defendants renewing their motion for summary judgment in light of the U.S. Supreme Court decision in *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n.,* 531 U.S. 288, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). The defendants have since filed a Renewed Motion for Summary Judgment [Doc. # 36] and the parties have submitted additional briefs on *Brentwood*'s impact.

For the following reason, the Renewed Motion [Doc. # 36] is GRANTED as to counts one and two for all defendants.

### I. *Factual Background* [2]

The defendant Area Cooperative Educational Services ("ACES") is a regional educational service center in Hamden, Connecticut. It was created to serve 26 local boards of education in the New Haven Area. ACES coordinates and staffs programs for children with special needs. It is governed by a Board of Directors (the "Board") comprised of individuals appointed by the boards of education that ACES serves. The powers of the ACES Board are derived from Connecticut General Statutes § 10–66a *et seq.* and the Amended Agreement Creating ACES (the "Amended Agreement"). *See* Def.s' Mem. in Supp. of Renewed Mot. for Summ. J. [Doc. # 37], Ex. 1. Defendants Peter Young and Cheryl Saloom were both officers of ACES at the time of Jenkins' termination. Young was ACES's Executive Director and Saloom its Deputy Executive Director.

---

**1.** This Court's subject matter jurisdiction is based on 28 U.S.C. § 1441 as the plaintiff's complaint alleged claims within this Court's original jurisdiction under Title 28 U.S.C. §§ 1331 and 1343. Personal jurisdiction is not contested.

**2.** The following facts are taken from the parties' motion papers and Local Rule 9(c) statements. Disputed facts are indicated.

Jenkins, an African–American, was hired by Young on June 14, 1989, as a "Teacher Aide/Driver." His job responsibilities included assisting ACES teachers and driving children to and from ACES programs in a vehicle provided by ACES. Jenkins was a member of a collective bargaining unit, which was covered by an agreement between ACES and the union. The collective bargaining agreement provided that employees were entitled to bring a grievance for any disciplinary action they received. The agreement also provided that employees could not be discharged without just cause. *See* Ex. To Def.'s Mot. to Dismiss, or in the Alt. For Summ. J. [Doc. # 15], Ex. F, Art. 12 ("An employee may be discharged, suspended or given a reprimand resulting in written documentation in his/her personnel file only for just cause.").

Jenkins was discharged on April 21, 1999. According to the defendants, the decision to terminate Jenkins's employment was motivated by a combination of two factors: 1) Jenkins had been disciplined four times for speeding in ACES vehicles while transporting children, and 2) Jenkins had been involved in an incident with an ACES student that occurred in February 1999, which the State Department of Children and Families ("DCF") investigated and then concluded constituted "physical neglect" by Jenkins. Each of these two factors is described more fully below.

*Speeding Violations*

The defendants' have submitted evidence that speeding incidents involving Jenkins occurred on four separate occasions: July 13, 1990, July 25, 1990, November 28, 1994, and February 26, 1997. *See* Exhibits to Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J. [Doc. # 15], Ex. G–K. According to the defendants, the first three incidents resulted in written employment warnings, and the fourth speeding incident resulted in a one-week suspension without pay. None of these disciplinary actions was grieved by Jenkins pursuant to the collective bargaining agreement. In his Local Rule 9(c)2 statement, Jenkins appears to deny that any of these alleged speeding incidents ever took place or that he was disciplined for them. *See* Pl.'s Loc. R. 9(c)2 statement, at ¶ 24. However, in Part II of his 9(c)2 statement, Jenkins does concede to at least one speeding incident, on July 13, 1990, but he claims that it was "reported by the plaintiff to the defendant contemporaneously as it was happening and was caused by a student in the plaintiff's vehicle. It did not result in any form of discipline . . . ." *Id.* at Part II., ¶ 2.[3] While apparently denying that he was ever disciplined for these speeding incidents, Jenkins asserts that "[a]fter each one of the alleged 'disciplinary' incidents involving the plaintiff . . . the defendants rehired the plaintiff at increased rates of pay." *Id.* at Part II., ¶ 3.

*February 1999 incident*

On February 3, 1999, a school nurse reported to Saloom that she had witnessed

---

**3.** The defendants submitted a letter memorializing the July 13, 1990 speeding incident. *See* Ex. To Def.'s Mot. to Dismiss, or in the Alt. For Summ. J. [Doc. # 15], Ex. G. While the letter does state that "this Notice is between you and I and may not become part of the documentation regarding your evaluation when the concern no longer exists" it also warns that "[i]f I [Elwood Shepard, the ACES Transportation Director] receive any other re-

ports of your speeding, I will recommend immediate termination as an ACES employee." *Id.* Also, the defendants have submitted evidence, in the form of a copy of a certified letter to Jenkins, that Jenkins was suspended without pay for one week following the alleged February 26, 1997 speeding incident, *see id.*, Ex. K, as well as letters of reprimand for the two other speeding incidents. *See id.*, Ex. I, J.

Jenkins grab a student by his shirt front, push him to the floor, and drag him in his chair. After hearing of this incident, Saloom spoke with two other aides who had been in the room with Jenkins and the child. Although one of the two aides did not witness the incident, the other aide reported seeing Jenkins pick up the child after the child refused to stand and witnessed a table leg break because the child's shoelace had been tied to it.

Jenkins disputes these versions of the incident. According to him, the child he was supervising was "sexually fondling" another child. Jenkins asked the boy to stop. When the child did not respond, Jenkins physically moved him to another part of the room and was able to get him to stop. Jenkins denies having dragged or in any way injured the child. *See* Pl.'s Loc. R. 9(c)2 Statement, Part II, ¶ 11.

This incident eventually led to an investigation of Jenkins by the State Department of Children and Families ("DCF").[4] The DCF investigator spoke with Jenkins, the nurse, and the two aides who were present at the time of the incident. The investigator also questioned the child, who reported that he had tied his shoelace to the table leg because Jenkins had previously grabbed him by his shirt. Based on its investigation, DCF concluded that Jenkins had engaged in "physical neglect of the child."

Following the DCF investigation, Saloom recommended to Young that Jenkins be terminated and Young agreed; Jenkins was then terminated. The defendants assert that the decision to fire Jenkins was based on both the DCF report and the four speeding incidents.[5] Jenkins disputes this, contending that his firing was motivated by racial animus.

Jenkins appealed his dismissal to the ACES Board, which denied his appeal. Jenkins then submitted a grievance, under his collective bargaining agreement, regarding his termination, which was heard by an arbitrator from the American Arbitration Association ("AAA"). The arbitrator found in favor of ACES, concluding that, based on the findings of the DCF investigation and the most recent speeding incident, ACES had just cause to terminate Jenkins. The defendants have moved for summary judgment. As to Jenkins' § 1983 counts, the defendants assert that under *Brentwood*, there is no state action. If the Court finds state action, the defendants assert they are still entitled to summary judgment on the basis of Eleventh Amendment immunity, qualified immunity, and that Jenkins has failed to present any evidence that he was discriminated against intentionally or that he was not afforded due process.

## II. *Summary Judgment Standard*

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91

---

4.  The defendants assert that "because of the discrepancies in the accounts of the incidents" defendant Saloom requested a DCF investigation. Def.s'Loc. R. 9(c)1 statement [Doc. # 38], at ¶ 32. In his Local Rule 9(c)2 statement, Jenkins agrees that DCF was contacted "but otherwise disagrees." Pl.'s Loc. R. 9(c)2 statement [Doc. # 42], at ¶ 32. Jenkins also asserts that the defendants waited

over a month before reporting the matter to DCF. *See id.* at II., ¶ 12.

5.  The termination letter cites the four speeding incidents and the February 1999 classroom incident investigated by DCF as the events underlying his termination for "abuse and neglect of students." Exhibits to Def.'s Mot. to Dismiss or, in the Alt., for Summ. J. [Doc. # 15], Ex. P.

L.Ed.2d 202 (1986). A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.' " *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

### III.  *§ 1983 Claims*

Section 1983 provides that any person who, acting under color of law, "subjects or causes to be subjected, any Citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws" of the United States shall be liable to the injured party in actions at law. 42 U.S.C. § 1983. Here, Jenkins asserts that the defendants deprived him of his constitutional rights to equal protection and procedural due process as guaranteed by the Fourteenth Amendment to the U.S. Constitution. However, as the language of § 1983 makes clear, in addition to demonstrating substantive behavior that would deprive the plaintiff of a constitutional right, a § 1983 plaintiff must also demonstrate that such conduct was conducted "under color of law." *Id.* Even before reaching the substantive merits of Jenkins' constitutional claims, then, it is necessary to determine whether the conduct of the defendants was conducted "under color of law" for purposes of § 1983.

### A.  *"State Action" and "Under Color of Law"*

In addition to § 1983's "under color of law" requirement, claims brought pursuant to the Fourteenth Amendment require a demonstration of "state action." "The State Action Doctrine refers to the constitutional guarantee under Section One of the Fourteenth Amendment that *no State* shall deprive any person of 'life, liberty, or property, without due process of law,' nor deny to any person 'equal protection of the law,' and requires that the wrongful conduct of private individuals have some connection to state authority to be actionable under the Fourteenth Amendment." *United States v. Nelson*, 277 F.3d 164, 175 fn. 9 (2d Cir.2002) (citations and internal quotation marks omitted) (emphasis added). The purpose of the "state action" requirement is to "preserv[e] an area of individual freedom by limiting the reach of federal law and avoi[d] the imposition of responsibility on the State for conduct that it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Brentwood*, 531 U.S. at 295, 121 S.Ct. 924. The Second Circuit has held that "the 'under color of law' requirement has consistently been viewed in the same

manner as the 'state action requirement' under the Fourteenth Amendment." *Annunziato v. Gan, Inc.,* 744 F.2d 244, 249 (2d Cir.1984).[6] Thus, the threshold inquiry for both Jenkins' constitutional claims is whether ACES and the two individual defendants engaged in state action and are thus subject to the scope of the Fourteenth Amendment and § 1983.

In a recent decision involving the defendants in this action and applying the U.S. Supreme Court's holding in *Brentwood,* this Court considered the question of whether the defendants ACES, Saloom, and Young were "state actors" when they allegedly violated the First Amendment rights of an ACES employee by allegedly pressuring her to give an African–American co-worker an undeserved negative performance review. *See St. Ledger v. Area Coop. Educ. Servs.,* 228 F.Supp.2d 66 (D.Conn.2002). This Court acknowledged that *Brentwood* does not set forth a bright-line test for state action, but rather illuminates the factors that should be considered in resolving the issue:

> In *Brentwood,* the Supreme Court recently clarified the test for "state action" as it had developed through *National Collegiate Athletic Assn. v. Tarkanian,* 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), and *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). The Court noted that "[w]hat is fairly attributable [as state action] is a matter of normative judgment, and the criteria lack rigid simplicity .... [N]o one fact can function as a necessary

condition across the board ... nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason ...." *Brentwood,* 531 U.S. at 295–96, 121 S.Ct. 924. Reviewing the tests for "state action" that had previously been set forth, the Court identified a "host of facts" which bear on whether an activity can be attributable to a state: "when the state exercises its coercive power or significant encouragement, when a private actor is a willful participant in joint activity with the state, when an entity is controlled by the state or an agency thereof, when an entity has been delegated a public function by the state, when an actor is entwined with governmental policies, or when the government is entwined in the entity's management or control." *Gorman–Bakos,* 252 F.3d at 552 (citing *Brentwood,* 531 U.S. at 296, 121 S.Ct. 924).

With these principles in mind, the Supreme Court in *Brentwood* found that the Tennessee Secondary School Athletic Association (the "Association"), which was comprised of member schools in the State of Tennessee and regulated interscholastic sports among its members, engaged in state action when it enforced a rule concerning the recruitment of student-athletes. The Court held that the Association's "regulatory activity may and should be treated as state action owing to the pervasive entwinement of the state school officials in the structure of the association, there being no offsetting reason to see the [A]ssociation's acts in any other way." *Brentwood,* 531 U.S. at 291, 121 S.Ct. 924.

---

**6.** While some cases suggest that there may be a distinction between "state action" and "under color of law," "[o]nly when there is joint action by private parties and state officials, could a distinction arise between these two requirements." *Lugar v. Edmondson Oil Co.,* 457 U.S. at 928 n. 8, 102 S.Ct. 2744 (1982). Since that is not the case here, the analysis for both elements is the same.

The Court found that eighty-four percent of the member schools of the Association were public schools. Additionally, the Court noted, under the Association's bylaws, each member school was represented by its principal or a faculty member, who selected members of the Association's legislative council and board of control from eligible principals, assistant principals, and superintendents. The Court found that public school officials not only controlled, but "overwhelmingly performed, all but the purely ministerial acts" by which the Association existed and functioned in practical terms. *See id.* at 298–99, 121 S.Ct. 924. The Court also noted that the Association's staff, although not paid by the State, were eligible to join the State's public retirement system for its employees, and that a member of the State Board of Education was an ex-officio member of the Association's board. *St. Ledger,* 228 F.Supp.2d at 70–71. This Court went on to conclude that ACES was similar to the Tennessee Secondary School Athletic Association at issue in *Brentwood. See id.* at 71. While it is true that the constitutional violations alleged here are different than the constitutional violation alleged in *St. Ledger,* this Court noted that "the entwinement of the State here is so pervasive that ACES should be treated as a state entity for all purposes, including its personnel decisions, especially in light of the State's significant encouragement and delegation to ACES of its function of carrying out public education." *Id.* at 72. Accordingly, for the same reasons articulated in *St. Ledger,* the Court finds that, as a matter of law, the defendants engaged in state action when they discharged Jenkins. Correspondingly, the Court concludes that Jenkins' termination was carried out "under color of state law." *See Annunziato,* 744 F.2d at 249. As the Court concludes that there was state action, it will next consider the merits of Jenkins' constitutional claims in the context of addressing the balance of the summary judgment motion.

### B. *Equal Protection*

Employment discrimination cases under § 1983 are subject to the same burden shifting analysis set forth by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, (1973) for claims brought under Title VII. *See Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir. 1989) ("The Supreme Court has outlined a three-step analysis of factual issues in Title VII .... By analogy, the same analysis applies to claims under § 1983."). Under the burden shifting framework, the initial burden is on the plaintiff to establish a prima facie case. *See id.* To establish a prima facie case, a plaintiff must show (1) that he belongs to a protected class, (2) that he was qualified for the position, (3) that he was discharged, and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). Once the prima facie case has been established, the burden then shifts to the defendant to offer a legitimate, nondiscriminatory rationale for its actions. *See James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000). Finally, if the defendant does offer a non-discriminatory reason for its decision, the burden again shifts to the plaintiff to show that the defendant's stated reason is a mere pretext for discrimination. *See Id.* (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–10, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). In some circumstances, under *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000), after the plaintiff offers evidence to show that

the defendant's asserted non-discriminatory reason for the hiring is pretextual, the evidence that established the prima facie case will be sufficient to survive a summary judgment motion. *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097 ("a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

█ It should be noted at the outset of this inquiry that "a plaintiff's burden of establishing a prima facie case in the context of employment discrimination law is 'minimal.'" *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 52 (2d Cir.2001)). Here there is no question that Jenkins belongs to a protected class (because he is an African–American) and that he was terminated. Whether Jenkins can demonstrate that he was qualified for the position and was fired under circumstances that give rise to an inference of discrimination require closer analysis.

█ The defendants assert that Jenkins was not performing his job duties satisfactorily and thus that he cannot satisfy the "qualification" prong of the prima facie case. As evidence of this, they put forth the four speeding incidents as well as the DCF report finding that Jenkins committed "physical neglect" in his supervision of an ACES student. However, the qualification prong presents a very low threshold for the plaintiff to satisfy: "To show 'qualification' sufficiently to shift the burden of providing some explanation of the discharge to the employer, the plaintiff need not show perfect performance. Instead, she need only make the minimal showing that *she possesses the basic skills necessary for performance of the job.*" *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir.2001) (citations and internal quotation marks

omitted) (emphasis in original). The Court in *Gregory* went on to warn against confusing the qualification requirement with the second stage of the burden-shifting analysis in which the employer offers a non-discriminatory rationale for the discharge:

In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified. Moreover, when, as in this case, the employer has retained the plaintiff for a significant period of time and promoted her, the strength of the inference that she possesses the basic skills required for the job is heightened. An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action. But the crucial point remains the same: the qualification prong, as to which the initial burden lies on plaintiff, cannot be transformed into a requirement that the plaintiff anticipate and disprove an employer's explanation that inadequate ability or performance justified the job action at issue.

*Id.* at 696–97. Similarly, in *Owens v. New York City Hous. Auth.*, 934 F.2d 405 (2d Cir.1991), when considering whether the plaintiff was collaterally estopped from meeting the qualification requirement by a state court decision finding gross insubordination, the Second Circuit held that:

We have no doubt that such misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee. This misconduct is distinct, however, from the issue of minimal qualification to perform a job. An individual may well have the ability to perform job duties, even if her conduct on

the job is inappropriate or offensive. Accordingly, the finding of misconduct here cannot preclude [the plaintiff] from showing her qualification for employment as required by *McDonnell Douglas.*

*Owens,* 934 F.2d at 409. Some courts have labeled the "qualification" element of the prima facie case as the "satisfactory performance" prong in cases alleging wrongful termination. However, the Second Circuit has explicitly stated that, even when so named, the prima facie case only calls for minimum qualification:

> As an initial matter, the district court overstated the requirements for a *prima facie* case. Instead of requiring [the plaintiff] to demonstrate the he was "qualified for the position," it demanded a showing that "he was performing his duties satisfactorily." We have ourselves used similar language. But in doing so we have not, of course, raised the standard set by the Supreme Court for what suffices to show qualification.... [a]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer.

*Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 91–92 (2d Cir.2001). As there is no dispute as to whether Jenkins was actually capable of performing the tasks assigned to him, he has met at least the threshold level of qualification required to make out this element of a prima facie case.

As the final component of his prima facie case, Jenkins must submit evidence that he was discharged in circumstances that give rise to an inference of discrimination. To establish this fourth prong of the prima facie case, Jenkins asserts that he was treated differently than similarly situated white employees. "One 'common and especially effective method' for a plaintiff to discharge this burden is to show 'that the employer treated a similarly situated employee differently.'" *Miles v. City of New York,* No. CV–99–7365JGRLM, 2002 WL 31410346, at *4 (E.D.N.Y. Oct.24, 2002) (quoting *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001)). However, Jenkins has not submitted evidence sufficient to carry his burden on this element. The only evidence Jenkins has submitted to suggest that he was treated differently than similarly situated Caucasians is his affidavit submitted in opposition to the motion for summary judgment. In paragraph five of his affidavit, Jenkins asserts that "I have personal knowledge that caucasians who were employed by ACES and actually received speeding tickets while driving for ACES, nevertheless were not fired because of getting those tickets. I believe this is an example of the racial discrimination practiced by the defendants." Pl.'s Ex. in Opp. to Def.'s Mot. to Dismiss of for Summ. J., Ex. 5, ¶ 5.[7] Jenkins has offered no specifics (such as the names of the alleged speeders, the circumstances surrounding their tickets, whether

7. In his affidavit, Jenkins also asserts that during his tenure at ACES, "there never was any non-caucasian person who held any executive, management or supervisory position although there were well-qualified non-caucasian employees capable of holding such higher positions." Pl.'s Ex. in Opp. to Def.'s Mot. to Dismiss of for Summ. J., Ex. 5, ¶ 3. However, Jenkins was not seeking, and did not ever hold any "executive, management or supervisory position" at ACES. Also, evidence submitted by the defendants indicates that there was at least one non-caucasian that held such a position with ACES. In a supplemental affidavit, Young asserts that "from approximately 1989 to 1999 Sharyn Esdaile, an African–American woman, was employed as the Artistic Director of Betsy Ross Magnet School. This is an administrative position at ACES." Reply Mem. in Supp. of Def.'s Mot. to Dismiss or for Summ. J. [Doc. # 21], Ex. R. Jenkins has not challenged this.

they were ticketed on multiple occasions, and whether children were being transported at the time), nor is his affidavit corroborated anywhere else in the record. Second Circuit precedent makes clear that certain uncorroborated affidavits by the non-moving party standing alone may be sufficient to create a genuine issue of material fact sufficient to survive summary judgment in a discrimination case. For example, in *Danzer v. Norden Sys., Inc.*, 151 F.3d 50 (2d Cir.1998), the Second Circuit reversed a district court's grant of summary judgment:

> [Defendant] argues that all of the evidence upon which Danzer relies to make out his prima facie case (and to defend against the motion for summary judgment) is only to be found in his extensive affidavit. Defendants characterize this affidavit as "self-serving" and "conclusory," and claim that it is, therefore, insufficient.

> As an initial matter, we find no evidentiary infirmity in [plaintiff's] detailed affidavit which chronicles in depth the various episodes giving rise to this suit . . . . To hold, as the defendants ask us to do, that the nonmovant's material allegations of fact are (because "self-serving") insufficient to fend off summary judgment would be to thrust the courts-at an inappropriate stage-into an adjudication of the merits.

*Danzer*, 151 F.3d at 57. *See also Lee v. American Int'l Group, Inc.*, 31 Fed. Appx. 764, 2002 WL 500360, at *1 (2nd Cir. April 3, 2002) (unpublished opinion) ("[T]he district court was required to credit plaintiff's testimony that [defendant's vice president] said this to her. The fact that the plaintiff had no corroboration and that [defendant's vice president] denied it were of no significance on defendant's motion for summary judgment."). However, the plaintiff in

*Danzer* submitted an "extensive" and "detailed" affidavit, while here Jenkins has merely submitted a five paragraph affidavit which contains no details or specific facts raising an inference of discrimination as to Jenkins or his discharge. Moreover, even accepting the affidavit as true, it does not constitute enough evidence from which a reasonable juror could conclude that similarly situated Caucasians were treated differently. "This showing requires that the other employee be 'similarly situated in all material respects.'" *Miles*, 2002 WL 31410346, at *4 (quoting *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir.1997)). The Second Circuit elaborated on the "all material respects" standard adopted in *Shumway* in *Graham v. Long Island R.R.*, 230 F.3d 34 (2d Cir.2000). The Court held that the standard "must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 40 (citations omitted). As noted above, Jenkins has asserted that Caucasian ACES employees were ticketed for speeding while driving for ACES but were not fired. This falls short of sufficient evidence that there were white employees that were "similarly situated in all respects." Jenkins has not offered evidence, nor has he even argued, that these unidentified persons were transporting children when they were ticketed, or that they had been speeding in ACES vehicles on multiple occasions. Most important, Jenkins has not presented evidence that white ACES employees who had endangered children a number of times while transporting them *and* who also had been cited by a state agency for neglecting students had been treated differently.[8] Both stated

---

**8.** Although Jenkins still contends that the DCF finding was wrong, the defendants were entitled to consider *that finding* in determining whether to discharge him. In addition,

bases for his discharge-the speeding and neglect in the classroom-concerned a common problem: how Jenkins dealt with children in his care, whether in a motor vehicle or in the classroom. Jenkins has not presented any evidence that white ACES employees were treated more leniently in a sufficiently similar situation.[9] Of course, evidence that others were not treated in a substantially similar way is not the *only* type of proof to show discrimination. However, in this case, there has been no other evidence presented.[10]

Thus, since Jenkins has not carried his burden of setting forth evidence from which a reasonable juror could conclude that he was terminated under circumstances that gave rise to an inference of discrimination, the defendants are entitled to summary judgment on his Equal Protection claim.

Even if Jenkins had established a prima facie case, however, the defendants would still be entitled to summary judgment on

this count. As indicated above, once the plaintiff has set forth a prima facie case, the burden shifts to the defendant to provide a non-discriminatory reason for the adverse employment decision. *See James*, 233 F.3d at 154 (2d Cir.2000). As discussed above, the defendants have asserted that the reasons for Jenkins' termination were a combination of 1) the four speeding incidents and 2) the conclusion from the DCF investigation. Having offered a non-discriminatory reason for the discharge, the burden again shifts to Jenkins to show that the non-discriminatory reasons offered by the defendants are merely a pretext for discrimination. *See Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–10, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Jenkins has not offered any evidence from which a reasonable juror could conclude that the defendants' stated reasons for the firing were pretextual. Even if true that white ACES employees had received speeding tickets but were not discharged,[11] there is no evi-

---

while Jenkins in his Local Rule 9(c)(2) statement did not concede the four speeding violations, the record clearly establishes that he had been disciplined those four times for speeding and that he did not contest them through the collective bargaining agreement. For the first three incidents, he received written warnings (including the prospect of termination for future incidents), and for the most recent speeding incident he was suspended for one week without pay. *See* Exhibits to Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J. [Doc. # 15], Ex. G–K.

9. It is also noteworthy that Jenkins was hired and fired by the same person: Peter Young. The Second Circuit has held that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir.1997).

10. Jenkins has also presented the Decision of the Appeals Referee on whether he was entitled to unemployment compensation following his termination, and the defendants' fail-

ure to appeal it, as evidence that the DCF finding was wrong. However, the standard applied by the referee was "wilful misconduct," which is different from the DCF finding. In any event, it still does not show any racial discrimination by the defendants or that the defendants were not entitled to rely on the DCF finding. Pl.'s Ex. in Opp. to Def.'s Mot. to Dismiss of for Summ. J. [Doc. # 19], Ex. 4.

11. Jenkins' first two speeding incidents occurred in 1990, nearly a decade before the his termination. If these incidents were the only evidence offered by the defendants as a non-discriminatory reason for the termination, it could be argued that, based on the age of the incidents, that they were a mere pretext for discrimination. However, the defendants assert that it was the combination of these incidents, the later speeding violations in 1994 and 1997, and the February 1999 DCF investigation that provided a non-discriminatory reason for the firing, and the Court is persuaded on that basis.

dence that they were transporting children at that time, there is no evidence that they drove dangerously on multiple occasions, and Jenkins has offered nothing to demonstrate that the defendants' other rationale-the DCF finding that Jenkins had been negligent-was a pretext for racial discrimination. It was this finding, in combination with the speeding incidents, that the defendants submit as the non-discriminatory rationale for the termination-not the speeding problems alone. Moreover, as mentioned above, both concerned the same issue which was the basis for his discharge: the way he treated children in his care. Both concerned whether he acted responsibly and carefully while he dealt with ACES children and both involved situations which created substantial danger to their well-being. There is nothing in the record of evidentiary value that indicates that this concern was a pretext.

Pursuant to *Reeves*, as noted above, Jenkins is entitled to rely on the evidence that comprised his prima facie case as evidence of pretext. *See Reeves*, 530 U.S. at 142, 120 S.Ct. 2097 ("[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual") (citations and internal quotation marks omitted). However, this does mean that a plaintiff may survive summary judgment simply by setting forth a prima facie case. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir.2001) ("Evidence of pretext, however, even combined with the minimal showing necessary to establish a prima facie case ... does not mandate a denial of summary judgment.") Rather, at this stage of the burden-shifting inquiry (in addition to examining pretext)

> the Court must examine the entire record to determine if the [plaintiff] meets [his] ultimate burden of persuading the fact-finder of a central element of a ... claim; namely, that defendants in-

tentionally discriminated against [him] on the basis of [his] race ... Whether summary judgment is appropriate here depends upon 'the strength of the plaintiff's prima facie case, the probative value of the proof that the defendants' explanation is false, and any other evidence' that supports the defendants' case.

*Id.* (citing *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097). *See also Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir.2001) (affirming summary judgment where plaintiff had established prima facie case but "ha[d] not offered any evidence that the [defendant's] justifications, even if pretextual, served as pretext for age discrimination.") (citations and internal quotation marks omitted); *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 93–94 (2d Cir.2001) (affirming summary judgment where plaintiff had set forth prima facie case but had not submitted sufficient evidence to show that the defendant's non-discriminatory rationale was pretext).

After considering "the strength of the plaintiff's prima facie case, the probative value of the proof that the defendants' explanation is false, and any other evidence that supports the defendan[ts'] case," the defendants are entitled to summary judgment on Jenkins' Equal Protection claim. The record as a whole does not support an inference that Jenkins was intentionally discriminated against on the basis of race.

For the forgoing reasons, the defendants renewed motion for summary judgment is GRANTED as to Jenkins' Equal Protection claim in count one of the complaint as to all defendants.

### C. Due Process

█ Count two of the complaint asserts that Jenkins was denied due process of law in the termination process in violation of

the Fourteenth Amendment. In analyzing a procedural due process claim, courts apply "the familiar two-step inquiry. [The Court] must determine (1) whether [the plaintiff] possessed a liberty or property interest and, if so, (2) what process was due before he could be deprived of that interest." *Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir.2002) (citations omitted). *See also Narumanchi v. Board of Trs. of the Connecticut State Univ.*, 850 F.2d 70, 72 (2d Cir.1988) ("*If* a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process.") (emphasis in original).

The first issue, then, is whether Jenkins possessed a property interest in his employment. It is well-settled that public employees may possess property interests arising out of their employment subject to protection under the Due Process Clause. *See Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d. Cir.2002)("A public employee who has a right not to be fired without 'just cause'... has 'a property interest in h[er] employment that qualifie[s] for the protections of procedural due process.'") (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885(2d Cir.1991)). Here, as noted above, the collective bargaining agreement did provide that "just cause" was required for termination. Thus, the question that remains in determining whether Jenkins had a property interest in his employment is whether he was a "public employee." As this Court has already determined that ACES is a state actor for "all purposes," it follows that Jenkins was also a public employee. Because Jenkins was a public employee who had a right not be fired without just cause, the Court must next consider whether the process that was provided was constitutionally sufficient to protect Jenkins' property interest in his continued employment.

■ The essential elements of due process are notice and an opportunity to be heard. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). However, the specific types of procedures that are due vary depending upon the nature of the property or liberty interest at stake. In determining what process is due regarding the deprivation of a property or liberty interest, the Supreme Court has set forth three factors that should be balanced:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Applying these factors to the termination of public employees, the Supreme Court has held that some pre-termination opportunity to be heard is essential. In *Loudermill*, the Supreme Court, after acknowledging that the individual's interest in continued employment was "substantial," held that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546, 105 S.Ct. 1487. However, the pre-termination opportunity to be heard need not be elaborate. Focusing on the third factor in *Mathews* the Court concluded that "[t]o require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." *Id.* In recent decisions, the Second Circuit has

also acknowledged that due process requires at least some measure of opportunity to be heard prior to termination. *See, e.g., Otero v. Bridgeport Hous. Auth.,* 297 F.3d 142, 151 (2d Cir.2002) ("The pretermination process 'need not be elaborate' or approach the level of a 'full adversarial evidentiary proceeding,' but due process does require that before being terminated such an 'employee [be given] oral or written notice of the charges against h[im], *an explanation of the employer's evidence,* and an opportunity to present h[is] side of the story.' ") (citations omitted) (emphasis in original); *Locurto v. Safir,* 264 F.3d 154, 171 (2d Cir.2001) ("When such a public employee is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards.") (citations omitted); *Zinker v. Doty,* 907 F.2d 357, 361 (2d Cir.1990) (same).

The collective bargaining agreement here and its grievance procedure provided substantial post-deprivation procedures and rights; Jenkins was entitled to arbitration under the collective bargaining agreement on whether there was just cause for his termination. His claims were arbitrated pursuant to the rules of the American Arbitration Association ("AAA") and the arbitration concluded that just cause existed. After reviewing the twenty-page Award of Arbitration [12] it is clear that Jenkins had a full opportunity to challenge his termination, including the issues raised in his complaint here. *See Costello*

*v. Town of Fairfield,* 811 F.2d 782, 786 (2d Cir.1987) ("It is well-settled that a procedure for post-deprivation arbitration of grievances created under a collective bargaining agreement may, in appropriate circumstances, satisfy the requirements of due process.") (Van Graafeiland, J., concurring). *See also Narumanchi v. Bd. of Trs. of the Conn. State Univ.,* No. H–86–51(PCD), 1986 WL 15753 (D.Conn. Oct. 6, 1986), *rev'd on other grounds.*

The record also indicates that Jenkins was afforded pre-termination procedures sufficient to satisfy the requirements set forth in *Loudermill* and *Otero,* when considered in combination with the post-deprivation arbitration. Although neither party has specifically argued in its motion papers that Jenkins did or did not have an opportunity to refute the bases for his discharge prior to its taking effect, it is uncontested that the ACES Board heard an appeal of the decision by Young of April 15, 1999 to terminate Jenkins. Jenkins himself has conceded that this review took place before the termination was final, indicating that this was, in fact, a pre-termination review. *See* Pl.'s Ex. in Opp. to Def.'s Mot. to Dismiss of for Summ. J. [Doc. # 19] ("2. Statement submitted by plaintiff to Board of Directors of defendant ACES in opposition to *proposed* termination of employment.") (emphasis added). *See also Id.,* Ex. 3 (indicating that Jenkins' last day of work was April 20, 1999 and that the effective date of his termination was April 21, 1999, despite the fact that Young's termination letter gave an effective date of April 14, 1999).[13] The ACES Board appeal sat-

---

12. *See* Supplemental Mem. in Support of Mot. to Dismiss or, in the Alternative, for Summ. J. [Doc. # 28], Ex. T.

13. Jenkins argued in his statement to the Board that "It would be perhaps virtually inconceivable to think justice could be found in a forum such as this." Pl.'s Ex. in Opp. to Def.'s Mot. to Dismiss of for Summ. J. [Doc. # 19], Ex. 2. However, the ACES Board's

review, in combination with the post-termination arbitration, satisfies the due process requirements for a pre-termination procedure. *See Locurto,* 264 F.3d at 174 ("No subsequent decisions from our Circuit or other circuits have held that ... a neutral adjudicator is a necessary component of due process at a pre-termination hearing.").

isfied the "minimal" pre-termination due process requirements. *See Fleming v. Kerlikowske*, No. 99–7677, 1999 WL 1212553, at *1 (2d Cir. Dec. 10, 1999) (holding that "exit interview" provided sufficient pre-termination process to satisfy *Loudermill*).[14]

Thus, because Jenkins was 1) made aware of the reasons for his discharge and the defendants' evidence concerning those reasons, 2) given an opportunity to "present his side of the story," prior to his discharge, and 3) had a post-deprivation arbitration proceeding pursuant to the rules of the AAA, the Court finds that Jenkins was afforded all the process he was due under *Loudermill*. Accordingly summary judgment is also GRANTED for all defendants on count two of the complaint.[15]

### IV. *Remaining State Law Claims*

The Court declines to exercise supplemental jurisdiction over the plaintiff's Connecticut state law claims on the ground that it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *Spear v. Town of West Hartford*, 771 F.Supp. 521, 530 (D.Conn.1991) ("[A]bsent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendant state law claims on the basis of a federal question

claim already disposed of . . . ."), *aff'd*, 954 F.2d 63 (2d Cir.), *cert. denied*, 506 U.S. 819, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992).

### V. *Conclusion*

For the preceding reasons, the defendants' renewed motion for summary judgment [Doc. # 36] is GRANTED and the case is DISMISSED.

---

14. In addition to the review by the ACES Board, Jenkins had other "opportunit[ies] to present h[is] side of the story," *Otero*, 297 F.3d at 151, with regard to both the DCF investigation and the speeding incidents. Jenkins was interviewed by the DCF investigator and he challenged the versions of the February 1999 incident offered by the other witnesses. Also, Jenkins did have an opportunity (of which he did not avail himself) to contest the prior speeding incidents for which he received written warnings and a suspen-

sion (at the time he received those warnings and the suspension) pursuant to the grievance procedures set forth in the collective bargaining agreement. *See* Ex. To Def.'s Mot. to Dismiss, or in the Alt. For Summ. J. [Doc. # 15], Ex. F.

15. In light of the Court's holding as to the merits of the plaintiff's § 1983 claims, it is unnecessary for the Court to reach the issues of ACES' Eleventh Amendment immunity and the individual defendants' qualified immunity.