Judith M. BALDWIN

v.

**PILGRIM NUCLEAR POWER STA-
TION, Entergy Nuclear Operations,
Inc., and Williams Service Group.**

Civil Action No. 06–CV–10856–RGS.

United States District Court,
D. Massachusetts.

Jan. 4, 2008.

John C. Bahrenburg, Greenport, NY, Joshua D. Krell, MandiJo Hanneke, Clark, Hunt & Embry, Cambridge, MA, for Plaintiff.

Keith B. Muntyan, Tracy Thomas Boland, Morgan, Brown & Joy, LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

Plaintiff Judith M. Baldwin brings this action challenging the denial of her application for unescorted access to the Pilgrim Nuclear Power Station (Pilgrim) in Plymouth, Massachusetts, a nuclear power plant operated by Entergy Nuclear Operations, Inc. (Entergy).[1] According to defendants, Baldwin was denied access privileges because of her willful concealment of material information regarding her criminal history. Baldwin claims that she omitted the information because the charges at issue were dismissed and never resulted in a conviction. She brings multiple claims against Entergy and Pilgrim, including age and gender discrimination, violation of Mass. Gen. Laws ch. 151B, § 4(9), violation of due process, breach of contract, breach of the implied covenant of good faith and fair dealing, intentional infliction of emotional distress, negligent infliction of emotional distress, violation of "public policy,"

1. Entergy is the parent corporation of Entergy Nuclear Generation Company, which owns Pilgrim. Pilgrim and Entergy are wholly private entities.

and violation of certain federal regulations.[2]

## BACKGROUND

The facts are taken in the light most favorable to Baldwin, supplemented where appropriate by additional facts offered by defendants that are not in dispute. Baldwin is a steampipe fitter and member of Local 777, United Association of Journeymen and Apprentices, Plumbing and Pipe Fitting Industry (Local 777), based in Meriden, Connecticut.

Pilgrim's nuclear generating plant requires the periodic installation of new fuel rods. Refurbishing the fuel rods requires shutting the plant for a period of two to three weeks. The industry term for a shutdown is "refueling outage" (RFO). To return the plant online as quickly as possible, maintenance work is scheduled twenty-four hours a day, seven days a week. During an RFO, the number of skilled workers required far exceeds those normally needed to operate and maintain the plant. Entergy contracts with a variety of companies that specialize in providing skilled workers to nuclear plant operators during RFOs. These companies typically hire journeymen and women through local unions. In March of 2003, Local 777 referred Baldwin to Williams Service Group (Williams) for an RFO placement at Pilgrim. Williams has a labor supply contract with Entergy and draws on a collective bargaining agreement with Local 777.

The relationship between Williams and Entergy is governed by a Multipurpose General Services Agreement (Williams Agreement), which "set[s] forth the terms and conditions under which" Williams provides services to Entergy. The Williams Agreement does not identify individual employees as intended beneficiaries. Nor does it make any provision for an employee to sue for a breach of its terms.

To work at Pilgrim, temporary workers like Baldwin must have unescorted access to the plant. Approval must be obtained under the terms of Entergy's Unescorted Access Authorization Program, which in turn is governed by regulations promulgated by the Nuclear Regulatory Commission. The regulations mandate that any licensee authorized to operate a nuclear power plant:

> shall establish and maintain an access authorization program granting individuals unescorted access to protected and vital areas with the *objective of providing high assurance that individuals granted unescorted access are trustworthy and reliable,* and do not constitute an unreasonable risk to the health and safety of the public including a potential to commit radiological sabotage.

10 C.F.R. § 73.56 (emphasis added). Pursuant to the regulations, each worker must complete a set of forms consisting of a Request for Unescorted Access and an Individual Disclosure and Fitness for Duty Statement. The disclosure form requires that the worker list, among other things, any criminal charges or arrests. Baldwin completed the disclosure form on March 31, 2003. She stated that she had been arrested, but not convicted, for driving under the influence (DUI) in Amston, Connecticut, on December 23, 2002. She did not disclose any other criminal charges. As was further required, Baldwin submitted a set of fingerprints to be sent to the Federal Bureau of Investigation (FBI).

On April 1, 2003, Entergy security personnel interviewed Baldwin about her dis-

---

**2.** The court dismissed Williams Service Group on January 5, 2007, after discovery revealed no evidence whatsoever that Williams played any role in the decision to deny Baldwin access to Pilgrim.

closure form. Among other things, the 2002 DUI arrest was discussed. Sometime thereafter and before April 9, 2003, Entergy received an FBI report indicating that Baldwin had been arrested and charged with larceny and interference with a police officer in 1980 and/or 1981.[3]

On April 9, 2003, Entergy security personnel met with Baldwin to discuss the discrepancies between her disclosure statement and the FBI report. Although Baldwin claimed that her only countable arrest was for the 2002 DUI, she admitted that she had been arrested in 1980. She could not recall the exact nature of the charges, but claimed that Connecticut law allowed her to treat the 1980 arrest as an event that had never occurred.[4] On more than one occasion, Baldwin asked to review the FBI report, but was denied permission by Entergy to do so.

Entergy security personnel considered Baldwin's attitude during the interview to be evasive and uncooperative. They further opined that Baldwin "appeared to be in denial" regarding the 1980 arrest and that she "appeared to have difficulty with authority and could possibly have difficulty following rules and regulations." As a result, Entergy denied Baldwin unescorted access to the plant for "willful omission or falsification of material information submitted in support of employment or request for unescorted access." Under Entergy's security program, neither Baldwin's 2002 DUI arrest nor the 1980 larceny charge would have automatically disqualified her from being granted unescorted access to the plant.

On April 17, 2003, Baldwin, through her attorney, filed an administrative appeal. Entergy's Appeal Review Committee met on June 9, 2003, and affirmed the decision to deny Baldwin unescorted access. Neither Baldwin nor her attorney was invited to be present at the meeting. Because of her denial of unescorted access to Pilgrim, Baldwin was disqualified from working at any nuclear power plant for one year.

On February 2, 2004, Baldwin filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) alleging age and gender discrimination. The MCAD was "unable to conclude that the information obtained establishes a violation of the statutes." On April 6, 2006, Baldwin brought this action against Pilgrim, Entergy, and Williams in the Plymouth County Superior Court. The case was then removed by defendants to this court on May 12, 2006, on federal question grounds. Count I alleges a violation of Mass. Gen. Laws ch. 151B, § 4(9) (discrimination by reason of a failure to disclose information regarding an arrest for which no conviction resulted); Count II alleges a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution (inadequate procedural safeguards in the Entergy appeal process); Count III alleges breach of contract; Count IV alleges breach of the implied covenant of good faith and fair dealing; Count V alleges a violation of public policy (using federal regulations to violate a plaintiff's secured rights); Counts VI and VII allege, respectively, intentional and negligent infliction of emotional distress; Count VIII alleges age-based and gender-

---

**3.** The record is unclear whether there was one arrest or two in 1980 and/or 1981.

**4.** Apparently, disposition of Baldwin's charges fell under Conn. Gen. Stat. § 54–56e (Accelerated Pre–Trial Rehabilitation), which provides that "[u]pon dismissal, all records of

such charges shall be erased pursuant to section 54–142a." Baldwin completed the required rehabilitation program and the charges were dismissed. It was her understanding that she could also deny that she had ever been arrested.

based discrimination in violation of Mass. Gen. Laws ch. 151B, § 4; and finally, Count IX alleges a violation of 10 C.F.R. 73.57(c). At a hearing on November 30, 2007, the court *ore tenus* dismissed Counts III, IV, V, VI, VIII, and IX.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gaskell v. Harvard Co-op. Soc.,* 3 F.3d 495, 497 (1st Cir.1993). "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 38 (1st Cir.1993). To succeed, the moving party must show that there is an absence of evidence to support the non-moving party's position. *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* The nonmoving party "must adduce specific, provable facts which establish that there is a triable issue." *Id.* "There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). A material fact is one that has the "potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993). For a fact to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements,* 43 F.3d at 735 (citation omitted).

*Count I—Mass. Gen. Laws ch. 151B, § 4(9)*

Mass. Gen. Laws. ch. 151B, § 4(9), prohibits employment practices that discriminate against employees for failing to reveal certain aspects of their criminal history. In Count I of the Complaint, Baldwin alleges that "defendants, in their respective capacities as employers and indirect employers of [Baldwin] and in connection with [Baldwin's] application for uncontested access necessary for her employment, excluded and discriminated against [Baldwin] by reason of her failure to furnish information ... for which no conviction resulted." Complaint ¶ 30. The statute limits the criminal history information an *employer or its agent* can elicit from a prospective *employee* in an *application for employment.*[5]

---

**5.** The statute prohibits, in relevant part, "an employer, himself or through his agent, in connection with an application for employment, or the terms, conditions, or privileges of employment, or the transfer, promotion, bonding, or discharge of any person, or in any other matter relating to the employment of any person, to request any information, to make or keep a record of such information, to use any form of application or application blank which requests such information, or to exclude, limit or otherwise discriminate against any person by reason of his or her failure to furnish such information through a written application or oral inquiry or otherwise regarding: (i) an arrest, detention, or disposition regarding any violation of law in which no conviction resulted ... unless such

Defendants contend that they are not subject to Chapter 151B liability because they have no employment relationship with Baldwin. In their view, Baldwin's background check, and the resulting denial of unescorted access to Pilgrim, did not preclude Williams, Baldwin's "real" employer, from assigning her to another job. Baldwin does not dispute that she was an employee of Williams. Instead, she argues that Entergy, through the Access Authorization Program, acted as an agent for Williams. In the alternative, Baldwin claims that her request for unescorted access constituted an application for virtual or "de facto" employment.

██ As an initial matter, it is clear that Entergy was not acting as an agent for Williams. An agency relationship arises "when there is mutual consent, express or implied, that an agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." *Theos & Sons, Inc. v. Mack Trucks, Inc.,* 431 Mass. 736, 742, 729 N.E.2d 1113 (2000). Entergy's role in conducting a security check of Baldwin was entirely self-interested: it was required by federal law to implement the security requirements of the NRC to retain its license to operate the Pilgrim plant. While Williams may have had a tangential interest in Entergy's survival as a contractual partner, the relationship between Williams and Entergy was exactly that—an arm's length contractual bargain displaying none of the indicia of a true partnership. Williams moreover had no ability to control the means by which Entergy conducted the security screenings. *Compare Patterson v. Barnes,* 317 Mass. 721, 722–723, 60 N.E.2d 82 (1945) (the essence of agency lies in the power of the principal to control the conduct of the agent). If anything, Entergy was acting as an agent for the NRC, insofar as it was attempting to comply with NRC regulations.

██ Baldwin argues in the alternative that Entergy should be deemed her de facto employer for Chapter 151B purposes. Chapter 151B defines "employer" and "employee" only in the negative.[6] *Comey v. Hill,* 387 Mass. 11, 15, 438 N.E.2d 811 (1982). In the usual case, a plaintiff will have no difficulty in establishing the existence of a direct employer-employee relationship. However, this case is unusual in that Baldwin claims only a de facto employment relationship with Entergy and Pilgrim. It is unclear whether Chapter 151B covers such a claim and the parties cite no Massachusetts case defining indirect employment under Chapter 151B. A federal district court, however, has held that "Title VII employer liability may attach ... to a party *that functions as an individual's de facto employer."*[7] *Bradley v. City of Lynn,* 403 F.Supp.2d 161, 166

---

person has been convicted of any offense within five years immediately preceding the date of such application for employment or such request for information." Mass. Gen. Laws ch. 151B, § 4(9) (emphasis added).

6. (5) " 'Employer' does not include a club exclusively social, or a fraternal association or corporation, if such club, association or corporation is not organized for private profit, nor does it include any employer with fewer than six persons in his employ, but shall include the commonwealth and all political subdivisions, boards, departments and commissions thereof...."; (6) "The term 'employee' does not include any individual employed by his parents, spouse or child, or in the domestic service of any person." Mass. Gen. Laws ch. 151B, § 1(5) and (6).

7. "Courts have used case law from the Americans with Disabilities Act, the Age Discrimination in Employment Act, and Title VII of the Civil Rights Act interchangeably." *Bradley,* 403 F.Supp.2d at 166, citing *Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.,* 37 F.3d 12, 16 (1st Cir.1994) (applying Title VII decision to an ADA case); *Camacho v. Puerto Rico Ports Auth.,* 369 F.3d 570, 573–574 (1st Cir.2004)

(D.Mass.2005) (emphasis added) (Human Resources Division (HRD) was an "employer" for Title VII purposes because it not only administered entrance examination but also exercised control over the relationship between the employee and her customary employers), citing *Camacho*, 369 F.3d at 574. The test is whether an entity "so extensively controls an aggrieved party's employment relationship as to become that party's de facto employer." *Id.* In applying this test, a court must consider:

> [t]he hiring party's right to control the manner and means by which the product is accomplished. Among other factors relevant to this inquiry are the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Bradley*, 403 F.Supp.2d at 167. No one factor is determinative, "[h]owever, in most situations, the extent to which the hiring party controls 'the manner and means' by which the worker completes her task will be the most important factor in the analysis." *Id.*, citing *Alberty–Velez v. Corporacion de Puerto Rico Para La Di-*

*fusion Publica*, 361 F.3d 1, 7 (1st Cir.2004) (analyzing the common-law agency test used to determine employee versus independent contractor status and finding no reason to apply a different test under Title VII). Although there are no reported Massachusetts cases applying this analysis to a Chapter 151B case, the court sees no reason why it should not apply.[8] *See Wheatley v. Am. Tel. & Tel. Co.*, 418 Mass. 394, 397, 636 N.E.2d 265 (1994) ("It is our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. c. 151B."); *Cox v. New England Tel. & Tel. Co.*, 414 Mass. 375, 382, 607 N.E.2d 1035 (1993) (same).

Construing the facts through the prism of common-law agency principles, it is clear that Entergy by its implementation of the Access Authorization Program, "acts as a 'hiring party' that extensively controls 'the manner and means' " by which temporary workers like Baldwin are chosen. *Bradley*, 403 F.Supp.2d at 169. Under NRC regulations, no person—whether an RFO worker, a visitor, vendor, or anyone else—can gain unescorted access to Pilgrim unless Entergy first determines that the individual is "trustworthy and reliable." Entergy admits that the entire screening process is handled "fully inhouse." Thus, Entergy exclusively controls access to Pilgrim, and that access determines who is permitted to work at the plant.

However, the issue remains whether Entergy exercises sufficient control over Baldwin to be a de facto employer in her case. Under *Bradley* and *Carparts*, an entity is an "employer" "if it exercises

---

(applying Title VII decisions to an ADEA case).

**8.** This would be consistent with the Supreme Judicial Court's caution against expanding Chapter 151B liability to "relationships outside the traditional common law employer-employee relationship." *Comey*, 387 Mass. at

15, 438 N.E.2d 811. As explained above, the de facto employer analysis is rooted in traditional common-law agency principles to which Massachusetts courts have routinely resorted. *See Speen v. Crown Clothing Corp.*, 102 F.3d 625, 629–634 (1st Cir.1996).

control over *an important aspect* of the employee's employment." *Bradley,* 403 F.Supp.2d at 169 (emphasis added). In *Bradley,* the HRD extensively controlled the hiring of municipal firefighters and police officers, which the court found was an important aspect of the employment relationship. At first glance, a similar situation exists here because Entergy exclusively controls workers' access to the Pilgrim plant. The determinative factor for the *Bradley* court, however, was the HRD's "pervasive role" with regard to other aspects of the employment relationship. *Id.* Among other things, the HRD played an extensive role in the promotion process, set health and physical fitness standards, and funded various employee wellness programs. *Id.* Here there is no evidence that Entergy controlled any aspect of Baldwin's work other than granting or denying her a clearance. All other aspects of Baldwin's employment were under the exclusive direction of Williams, her true employer. Absent a showing of a pervasive control of the employment relationship by Entergy, the motion for summary judgment as to Count I must be *ALLOWED.*

### Count II—Violation of Due Process

In Count II of the Complaint, Baldwin alleges that the "actions of the defendants in causing [her] to be barred from working in any nuclear power facilities for one year constitute a deprivation of property that violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution." Complaint ¶ 34. According to Baldwin, defendants violated

her due process rights by barring her participation in the hearing of her appeal of the denial of her clearance.[9]

■ As a rule, the Fourteenth Amendment protects individuals only against government and does not reach the conduct of private actors. "Yet under several doctrines, acts by a nominally private entity may comprise state action, e.g., if, with respect to the activity at issue, the private entity is engaged in a traditionally exclusive public function; is entwined with the government; is subject to governmental coercion or encouragement; or is willingly engaged in joint action with the government;" *Logiodice v. Trustees of Maine Cent. Institute,* 296 F.3d 22, 26 (1st Cir. 2002), citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 296–296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001); or where "an elaborate financial or regulatory nexus ties the challenged conduct to the State." *Carmack v. Massachusetts Bay Transp. Authority,* 465 F.Supp.2d 18, 27 (D.Mass.2006).[10] The inquiry is fact specific.

■ While recognizing that Entergy and Pilgrim are private entities, Baldwin claims that they are nonetheless state actors because their "conduct was taken pursuant to the federal NRC regulations."[11] However, "the mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 42

---

9. Baldwin's Complaint fails to allege that adequate remedies are unavailable under state law, which alone is fatal to her procedural due process claim. *See Rumford Pharmacy, Inc. v. City of East Providence,* 970 F.2d 996, 999 (1st Cir.1992). As explained below, however, Baldwin's claim fails for a more substantive reason that is incurable by an amendment to the Complaint.

10. Carmark is a section 1983, "under color" of law case, but courts have consistently treated that analysis as the same as the state action analysis required under the Fourteenth Amendment. *See Barrios–Velazquez v. Asociacion de Empleados del Estado Libre Asociado de P.R.,* 84 F.3d 487, 491 (1st Cir.1996).

11. Baldwin cites no federal case (or any case at all) in support of this proposition.

L.Ed.2d 477 (1974). The state action theory most closely approximating Baldwin's argument is the "entwinement" doctrine. Under that doctrine, "a private entity may be classed as a state actor when it is entwined with governmental policies or when government is entwined in its management or control." *Logiodice*, 296 F.3d at 27 (private school which was required by contract with a public school district to accept and educate all of the district's high school students was not a state actor with respect to the imposition of student discipline because the school was run by private trustees and the contract provided that the trustees would have the sole right to administer and enforce discipline). But *see Brentwood Acad.*, 531 U.S. at 296, 121 S.Ct. 924 (private association that set and enforced standards for athletic competition among private and public schools was a state actor because it was administered primarily by public officials). Here, like the private entity in *Logiodice*, and unlike that in *Brentwood*, Entergy and Pilgrim are run by private parties who administer the Access Authorization Program without any involvement or oversight by public officials. Moreover, although the NRC regulations require Entergy and Pilgrim to certify that all persons granted access to the plant are "trustworthy and reliable," nothing in the regulations prescribes the particular means by which that end is to be accomplished. The NRC instead has delegated to Entergy and Pilgrim the right to promulgate, administer, and enforce all rules pertaining to the granting of access to the plant *on their own terms*, so long as the result is consistent with the NRC's overall goal of plant security. Such flexibility and discretion is not consistent with the pervasive "entwinement" that will cause a private entity to be held liable as a state actor. *See, e.g., Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025 (10th Cir.2007). Therefore, defendants' motion as to Count II will also be *ALLOWED*.

*Count VII—Negligent Infliction of Emotional Distress*

■ Among other elements,[12] a plaintiff in an action for negligent infliction of emotional distress must "corroborate [her] mental distress claims with enough objective evidence of harm to convince a judge that [her] claims present a sufficient likelihood of genuineness to go to trial." *Sullivan v. Boston Gas Co.*, 414 Mass. 129, 132, 137–138, 605 N.E.2d 805 (1993) (broadening and relaxing the "physical harm" test). *See Rodriguez v. Cambridge Hous. Auth.*, 443 Mass. 697, 702, 823 N.E.2d 1249 (2005) ("[I]n the *Sullivan* case, '[w]e did not eliminate the physical harm requirement, but merely expanded the range of symptoms that may provide the type of objective evidence to prove physical harm to include symptoms that could be classified as more 'mental' than 'physical.' ' ").

■ Here, Baldwin offers no evidence of objective physical manifestations to corroborate her emotional distress claim. For example, Baldwin fails to cite any particular date or time on which she experienced severe distress or any related medical findings. All Baldwin offers are her subjective feelings of "humiliation" and her "very emotional" reaction to being denied a clearance. Subjective complaints do not satisfy the standard. "[U]pset, anger, or grief, . . . these feelings alone do not constitute sufficient physical manifestation." *Gutierrez v. Massachusetts Bay*

12. The elements of the tort that a plaintiff must establish are: (1) negligence; (2) emotional distress; (3) causation; (4) objective evidence of physical manifestation of mental distress; and that (5) a reasonable person would have suffered emotional distress under the circumstances of the case. *Sullivan*, 414 Mass. at 132, 139, 605 N.E.2d 805; *see also Flanagan v. Baker*, 35 Mass.App.Ct. 444, 449–450, 621 N.E.2d 1190 (1993).

*Transp. Auth.,* 437 Mass. 396, 413, 772 N.E.2d 552 (2002) (compiling cases—objective manifestations include symptoms such as uncontrollable crying spells, loss of a sexual relationship, gastrointestinal distress, tension headaches, and depression).[13] Therefore, defendants' motion as to Count VI is also *ALLOWED.*

### ORDER

For the foregoing reasons, Entergy and Pilgrim's motion for summary judgment is *ALLOWED* in its entirety. The Clerk will enter judgment accordingly and close the case.

SO ORDERED.

---

13. The evidence in the record indicates that Baldwin suffered from depression prior to any encounter with defendants.